186 May 15, 2013 No. 26

IN THE OREGON TAX COURT
REGULAR DIVISION

HEWLETT-PACKARD COMPANY,
*Plaintiff,*

*v.*

BENTON COUNTY ASSESSOR
and Department of Revenue,
*Defendants.*

(TC 4979)

Plaintiff (taxpayer) appealed to the Magistrate Division of the Tax Court as to the real market value of its facility in Benton County. The appeal was subsequently specially designated to the Regular Division. Taxpayer argued that Defendant (the department) had improperly assessed its property by failing to consider functional and external obsolescence factors and nonvalue added costs. Following trial, the court found that the department's appraisal methodology was fundamentally flawed primarily because it did not include a highest and best use analysis. The court found taxpayer's expert experienced, understandable, careful and credible, and that taxpayer's argued values were supported by the evidence in the record.

Trial was held November 14 to 18, 21 to 23, and 28 to 30, 2011, in the courtroom of the Oregon Tax Court, Salem.

David L. Canary and Cynthia M. Fraser, Garvey Schubert Barer, Portland, argued the cause for Plaintiff (taxpayer).

James C. Wallace and Joseph A. Laronge, Senior Assistant Attorneys General, Department of Justice, Salem, argued the cause for Defendant Department of Revenue (the department). Defendant Benton County Assessor did not appear.

Decision for Plaintiff rendered May 15, 2013.

**HENRY C. BREITHAUPT, Judge.**

## I.  INTRODUCTION

This matter is before the court after trial and post-trial briefing. The tax years at issue are 2008-09, 2009-10, and 2010-11. The parties have no disagreement as to land value or machinery and equipment (M&E), but are significantly separated on their views of the real market value

(RMV) of the buildings and structures located at a site in Corvallis, Oregon. With regard to that issue the court has reviewed the record and transcript of this lengthy trial, especially the testimony of the appraisal witnesses.

## II.   FACTS

Of the great many facts established and discussed during the course of the trial on this matter, a summary of some are helpful to the court's analysis. Other facts are mentioned in the portions of this Opinion where they have relevance.

The buildings in question were constructed on a large campus of approximately 180 acres in Corvallis, Oregon. The buildings were constructed over the period from 1970s to the late 1990s. The buildings together contain an area of approximately 2 million gross square feet and were specifically constructed for the owner-occupant. The buildings were initially used in the manufacturing of Plaintiff's (taxpayer's) well known hand held calculators. With the development of taxpayer's proprietary ink-jet printer technology in the 1980s, the use of the buildings for manufacturing of calculators ceased and the focus of use of the then existing buildings shifted to the ink-jet business. The growth of that business was explosive and eight buildings were constructed in the 1990s.

The original use of some of the early buildings included manufacturing of silicon wafers and integrated circuits. That use became relatively quickly outdated as evolving technology outstripped the physical limitations of the buildings. By 2007 only two of an original four "fab" areas remained at all operative. However, the rapid growth of the ink-jet business brought the employee population in the buildings to a high of approximately 8,000. As of the assessment dates at issue in this case the employee population had been reduced to between 2,000 and 2,500. The reduction in work force reflected a decision by taxpayer to outsource many of the functions previously performed in Corvallis.

The land use approvals applicable to the campus contemplate manufacturing uses and related support functions with the related functions to be secondary in

character. The buildings are constructed along a long corridor that links most of the buildings together. Utilities and other services to the buildings, such as air conditioning, are centrally supplied and not separately metered to the buildings, another reflection of the construction of the buildings by an owner-occupant.

The roll values for the buildings and structures for the 2008-09 and 2009-10 years were initially substantially below the levels for which Defendant Department of Revenue (the department) now contends. When taxpayer appealed other components of value, the department counterclaimed as to the value of buildings and structures, significantly increasing the asserted value for that component of the property.

## III.  ISSUES

The issues in this case are the proper RMV for the buildings and structures at taxpayer's Corvallis campus for the years 2008-09, 2009-10, and 2010-11.

## IV.  ANALYSIS

A.  *Highest and Best Use*

In discussing highest and best use (HBU), it is important to identify the property that is the subject of the analysis. In this case the property is comprised of all the buildings on taxpayer's campus in Corvallis, Oregon. This is not a case involving one or another or some of the buildings. This case considers all of the buildings.

The first question that must be addressed in a credible appraisal is the question of highest and best use (HBU) of the property subject to valuation. *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 801 P2d 809 (1990). This first step sets a critical framework within which the valuation process occurs. Most importantly, the HBU affects what other properties may be considered comparable, a fundamentally important question when selecting so called "comparable" sales and determining, where appropriate, which properties are selected for use in determination of elements of the income indicator analysis.

Often there is little or no question that the current use of a property is the HBU. However, especially in times of general economic transition or transition in particular industries, an analysis of HBU is absolutely necessary. In this case the record demonstrates that both in general terms and in terms of the industry in which this property has been employed, significant changes were underway that could well cause the property to have a different HBU. That fact notwithstanding, the appraiser for the department did no HBU analysis. That raises a very serious problem as the leading authority on appraisal, recognized as such by both parties, requires an income analysis for financial feasibility. Appraisal Institute, *The Appraisal of Real Estate* 186 (13th ed 2008).

On the question of HBU analysis and any reflection of that in her report, the testimony of the department's appraiser was that no evaluation was contained in her report. On this subject particularly, and in other areas of the testimony generally, the appraiser was so evasive and confusing that the court cannot place much, if any, weight on her testimony or work. The department's positions on brief fare no better. The department continually confuses analysis of HBU with development of an income indicator of value.

The appraiser for taxpayer did perform an HBU analysis. That analysis looked at the costs, over time, of converting the existing space into space suitable for leasing to others and then weighed that cost against reasonably expected returns over time. Taxpayer's appraiser concluded that the HBU of a significant portion of the property—the so-called "non-core property"—did not contribute any value to the improvements as a whole as the cost of conversion to marketable space exceeded the benefits of such conversion.

In arriving at that conclusion, taxpayer's expert evaluated the market and concluded that a potential buyer of the property at issue would buy it to use approximately 1.2 million square feet (the "core property") for a variety of uses typical of a manufacturing and research and development operation but would pay nothing for the remaining building space. The square footage numbers relate to

rentable square feet rather than gross square feet. The "core property," as determined by taxpayer's appraiser, is approximately the same square footage as was occupied by taxpayer on the assessment dates. The testimony of that appraiser indicates that he looked at market usage of such spaces and not just the actual usage by taxpayer. On these points the conclusions of taxpayer's appraiser are highly persuasive. Further it does not, as suggested by the department, confuse market evidence with the actual use by the existing owner. The analysis done by taxpayer's expert assumed that the owner of the core space would, in effect, pay market rates for the space it used.

The department's appraiser placed substantial reliance on what property was actually occupied by taxpayer on the various assessment dates. This was a fundamental error as the actual use of the property by the current owner cannot govern the analysis. The analysis must be governed by what use a hypothetical purchaser would make of the property.

The department's appraiser appears to have concluded that all of the space at the campus, with the exception of Building 2, the so-called "fab," would be purchased for the purpose of leasing the space to a variety of users. However, the department's appraiser did no objective analysis to support this conclusion. The department seeks to avoid the consequences of the failure of its appraiser to engage in an analysis of HBU by simply stating that its conclusions are "axiomatic." The primary appraisal witness for the department, asked if a hypothetical purchaser would use all of the buildings comprising the subject property, testified that she "assumed" that would be the case and accordingly did no economic feasibility study. The court rejects such an approach, both in general or as to any particular element or step in the valuation process. Value is a question of fact, not the application of axioms—elements of logical analysis employed without regard to actual facts. Without analysis, and based only on her assumptions, the appraiser for the department concluded that the space not used by a hypothetical purchaser of the property—the so called "non-core" space—would be absorbed by other users in the market, at

very healthy lease rates and with few, if any, conversion costs to make the existing space attractive at such lease rates. All of the evidence regarding the actual demands of the market in Corvallis, the location of the property relative to major transportation facilities, the actual condition of the property and other factors indicates that the department's witness is simply wrong and unrealistic.

The failure of the department to undertake an analysis of HBU places its appraisal in a severely handicapped, if not fatally flawed, position. The court also notes that the department appraiser made significant contradictory statements about HBU—at one point considering the whole campus as prime investment grade property and at another time agreeing with taxpayer's expert that the conversion of the property to an office park was not feasible. The court simply cannot rely on much, if not all, of the work or testimony of this witness for the department. Suggestions in the department brief that the witness was not allowed to explain contradictions are not supported by anything in the record on redirect examination explaining contradictions.

The analysis of HBU performed by the appraiser for taxpayer, while perhaps not free from criticism, is, in the opinion of the court, properly supported. The expert for taxpayer actually tackled the problem rather than relying on axioms. The disjointed and at times confused cross-examination of taxpayer's appraiser did little if anything to weaken the credibility of that witness. More importantly, the most important conclusion in the analysis—that there is a significant amount of space in the improvements that does not contribute value to the property—is consistent with the unrebutted testimony of witnesses for taxpayer with knowledge of these improvements in particular and the market for space in Corvallis in general. The court accepts the conclusion that the costs of maintaining the excess space and converting it to space that would be attractive to the market would exceed the value to be produced by the potential rental of that space. In addition, the record shows that there are not insignificant questions about the legal obstacles that would be presented by trying to lease out the excess space.

The court finds that the HBU as found by the appraiser for taxpayer is the HBU of the property. Accordingly, the valuation exercise is of the core area as determined by that appraiser, with no value assigned to the non-core space.[1]

B.   *The Indicators of Value; Choice of Indicators*

There is no dispute between the parties that there are three indicators of value: the income indicator, the cost indicator, and the comparable sales indicator. In his valuation of the property, the appraiser for taxpayer did not perform an analysis of the income indicator. This was based on his conclusion that the HBU of the property was use by a single manufacturer using the core space and leaving the excess space empty. As to the core space, the appraiser for taxpayer used the cost approach and an indicator based on what the market rent would be for the owner occupant. The court agrees with that approach to valuation for owner occupied property.

The department suggests that the failure by taxpayer's appraiser to develop an income indicator of value is fatal to his appraisal. That is not so. In cases where the HBU is occupation and use of a special purpose facility by the owner, it is an accepted view that the income indicator is not practically available or useful. That judgment of the appraiser for taxpayer is supported in this record and accepted by the court.[2] The appraiser for the department purported to employ all three indicators of value. Those were applied to all space except Building 2 (the major "fab" building). To any such conclusion the appraiser for the department then added a value amount, determined under the cost indicator, for the "fab" Building 2. The witness was unable to provide any authority for using this method of mixing indicators of value.

---

[1] The parties are in disagreement as to how much space is properly considered as in the core area as opposed to the excess space area. The court finds that the conclusions of the appraiser for taxpayer are, more probably than not, correct. Most importantly, they are fully supported by the onsite manager most familiar with the property whose testimony was not rebutted by the department.

[2] The department objects that the approach of the appraiser for taxpayer reflects somehow value in use as opposed to market value. The court does not agree. Rather, the appraiser for taxpayer properly concluded that a purchaser of the property would purchase it for use and not as an investment, the return on which would come from rental of the buildings to others.

C.   *The Comparable Sales Indicator*

In their approaches to this indicator of value, the appraisers for the parties took materially different approaches. The appraiser for taxpayer, following his determination of HBU, looked at sales of manufacturing campus clusters for indications of value for the core space. The appraiser for the department did not rely on sales of larger manufacturing campuses. Rather, she gathered smaller properties located at some distance from the subject. In addition, the comparables chosen by the appraiser for the department were for the most part located in areas such as Hillsboro, Oregon, where, unlike Corvallis, there is a "critical mass" of properties of the types found at the subject property.

The major weakness of the approach followed by the appraiser for the department was that she concluded that sales data for relatively smaller buildings with multi-tenant features could be used in valuing a collection of buildings with overall rentable area in excess of one million square feet to be leased to one tenant, the one tenant feature being a result of the conclusion of the court as to HBU. The appraiser concluded that such size and use differences were not shown in the market as making a difference in sale price. The data relied on by the appraiser did not however contain comparisons of actual sales with such wide variations in size. Further, on cross-examination this witness admitted that the sales she relied upon did not necessarily reflect the actions of buyers that would purchase the subject property. Throughout the examination on this subject the department's witness was evasive, inconclusive and, at times actually or seemingly contradictory. The court places little or no weight on the comparable sales analysis done by this witness.

The appraiser for taxpayer examined several sales of properties of size comparable to the core area of the subject. The evidence developed by the witness indicated that there was a size adjustment necessary in comparing properties of significantly different sizes, a conclusion consistent with *The Appraisal of Real Estate*. Although the conclusions

of taxpayer's witness as to comparability and appropriate adjustments are not free from any criticism, the evidence he adduced and his approach to adjustments is by far superior to the work of the department's witness in those areas.

D.  *The Cost Factor*

Both appraisal witnesses agreed on the basic approach in developing a cost indicator of value: determination of replacement cost and subtraction from that figure of physical depreciation, functional obsolescence, and economic obsolescence.

The appraiser for the department began her analysis with a significant factual error. The evidence establishes, far more probably than not, that the buildings have not been renovated regularly, even though she concluded they had been. The conclusion of the department witness as to the comparison of actual age and effective age of the buildings on the campus was wrong. Accordingly her calculation of physical depreciation, even if otherwise performed correctly, was erroneous. Taxpayer's witness Chris Hanson was knowledgeable and his testimony contradicted the conclusions of the department's appraiser. The witness for taxpayer did not make the same error.

The appraiser for the department also concluded that the campus buildings suffered from no functional obsolescence. Given the testimony as to the original construction of the buildings and a comparison of their historic use with the use this appraiser concluded would be highest and best, the conclusion of the witness on this point is simply not credible. Many of the buildings were quickly and inexpensively constructed in order to meet immediate needs of taxpayer, with no concern for alternative uses or ultimate disposition. Large floor plates and interior improvements of, in most cases, limited quality result in buildings that would need significant investment in order to be used for the purposes that the department's witness concluded would be their highest and best use. With the possible exception of Building 10, this is especially true of the space which the department's witness concluded would be capable of being leased at class A rates.

As to Building 2, the evidence was unrebutted that its characteristics were completely out of date as to use in semiconductor fabrication. Yet the department witness made no adjustment for functional obsolescence for this building. That makes the conclusions of the department witness in this regard unreliable.

As stated above, the court accepts the HBU conclusion of taxpayer and rejects that of the department. From that point it follows that taxpayer's conclusion as to functional obsolescence due to superadequacy is accepted. It also follows that the department's conclusion that there is no functional obsolescence must be rejected.

The acceptance of taxpayer's conclusion also fits the evidence. This campus is the product of an explosion of growth related to a technology—printer heads—in a location removed from technology or manufacturing centers and poorly located in terms of transportation and labor force. When the printer head technology was developed to the point that manufacturing was most economically outsourced, the workforce at the campus was radically reduced and many of the activities that had occurred there were curtailed. The change in technology production realities made significant portions of the campus superadequate to taxpayer's needs. However, in terms of market value analysis, the record developed by taxpayer also shows that the campus became superadequate for typical market needs for campuses of buildings of this type.

The conclusions as to the cost indicator reached by the appraiser for taxpayer are accepted and those of the appraiser for the department are rejected.

E.  *Income Indicator*

The accepted conclusion as to HBU also drives the conclusion that an income factor analysis is not appropriate in this case. The HBU accepted by the court is that of an owner occupying and using the core space at the campus and paying market rents to do so. The income approach to value would be appropriate if the property could be sold to an investor who would undertake necessary conversion and lease the property out to multiple users. That is neither the HBU found by the court nor one justified by the record.

Again, the factual record prevents the conclusions reached by the department. That record shows that the market for rental space in the Corvallis area simply would not support a decision by an investor to buy the collection of buildings that are the subject of this case with the goal to convert them into space to be leased to multiple users at rents anywhere approaching the rents that the department appraiser believes would be paid by ultimate users of the space. The record and the site visit conducted by the court support a conclusion that the conversion costs to make much of the space into the type accepted by the market would, to be economically feasible and sensible, lead to rents that the physical realities and location of this space simply would not support. Far from transportation infrastructure and major populations, this campus was constructed as a unified operation of a user interested in utility rather than, for the most part, quality. The facts regarding Building 7 are particularly representative of this.[3] The factual bases as to conversion costs and rents used by the department appraiser, while they may support the conclusion reached by that witness, are simply not credible. The court rejects those conclusions.

## V.   CONCLUSION

The appraiser for taxpayer had significantly more experience in the valuation of properties of the type present here. Notwithstanding the attempts by the department to suggest that he was not credible, the court found him experienced, understandable, careful, and credible. The same cannot be said for the appraiser for the department.

For the foregoing reasons, the real market values for the subject property as found by the appraiser for taxpayer are accepted by the court as the real market values for the subject properties as of the respective assessment dates. Now, therefore,

---

[3] It is also disturbing to the court that the department repeatedly suggests that use by taxpayer of space to house very functional cubicles means that the space is office space of the type than can command the highest rents in the market without significant tenant improvements. The cubicle approach is another prime example of the utilitarian approach of taxpayer and not the market expectation of someone paying rent at the highest levels.

IT IS THE DECISION OF THIS COURT that the real market values for the subject property as found by the appraiser for Plaintiff are accepted by the court as the real market values for the subject properties as of the respective assessment dates.