IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

YAMHILL HOUSE, LLC,                    )
                                       )
                Plaintiff,             )      TC-MD 140156D
                                       )
        v.                             )
                                       )
MULTNOMAH COUNTY ASSESSOR,             )
                                       )
                Defendant.             )      **FINAL DECISION**

This Final Decision incorporates without change the court's Decision, entered

April 29, 2015. The court did not receive a statement of costs and disbursements within 14 days

after its Decision was entered. *See* TCR-MD 16 C(1).

Plaintiff appeals the Multnomah County Board of Property Tax Appeals (BOPTA) order,

dated March 11, 2014, determining that the 2013-14 real market value of property identified as

Account R193328 (subject property) was $891,960. A telephone trial was held on

January 13, 2015. Randal Acker, Attorney at Law, appeared on behalf of Plaintiff. Jon Deskin

(Deskin), State General Certified Appraiser, testified on behalf of Plaintiff. Barry Dayton

(Dayton), Property Appraiser III, appeared on behalf of Defendant. Scott Elliott (Elliott),

County Property Appraiser 3, testified on behalf of Defendant.

The court sustained Defendant's objection to Plaintiff's Exhibit 1, an appraisal report

prepared by Pamela Swartz (Swartz's report), because Swartz did not testify. Plaintiff's Exhibit

2, Deskin's limited report (Deskin's report), was admitted over Defendant's objection. At the

time that Defendant offered Exhibit A, Plaintiff objected, stating a lack of foundation and

Defendant withdrew its request to admit its Exhibit A. Defendant failed to subsequently offer its

Exhibit A.

## I. STATEMENT OF FACTS

Deskin, who stated that he has been a real estate appraiser for more than forty-two years, testified that the subject property is located in an urban neighborhood in uptown Portland and is "zoned RH, which is a high density, multi-growing residential zone within the city of Portland." (*See* Ptf's Ex 2 at 3, 11.) Deskin testified that the subject property is a "duplex and has even been approved to be * * * a triplex." Deskin testified that the subject property's commercial neighborhood includes a four-plex, a hotel, a high-rise, a large multi-family complex, restaurants, and shops.

Elliott, who stated that he has appraised thousands of properties and is currently a county appraiser, testified that the subject property was built in 1882 as a single-family residential home and was "built with high-quality materials, architecture, and craftsmanship" that would be "difficult to impossible to replace today." Elliott testified that according to "City of Portland historical records," the subject property is an "outstanding and pristine example of a fully developed Queen Anne-style home" with "two stories, a finished attic, and an unfinished basement." Elliott testified that "[t]he first and second level" total "3,600 square feet of owner-occupied space[,]" while a tenant occupies the finished attic area. Elliott also testified that the subject property "meets the requirements of the National Register of Historic Places," and recited several of the subject property's characteristics: "eyebrow windows," which are "very rare to find," and antique stained glass windows; "superior curb appeal;" and "superior quality construction."

Elliott testified that "the period appeal has been preserved" in the subject property's interior, stating that "the entire main level shows very extensive use of large or heavy crown moldings, chair railings, ceiling beams, pocket doors, and fireplace mantels, et cetera. Generally,

this level of extensive woodworking [is] extremely rare in modern homes and generally only found in homes built many decades ago." Elliott testified that "[t]he kitchen has undergone an extensive remodel using high quality materials." Elliott testified that "[o]ne of the full baths has a claw tub, an antique pedestal sink, and it's been well maintained to period style."

A.    *Highest and Best Use*

Deskin testified that the subject property is a "legal duplex; a duplex or multi-family property is the highest and best use." (*See* Ptf's Ex 2 at 11.) Deskin testified that on the assessment date, the main unit was owner occupied and the other unit was income producing.

Elliott testified that the subject property is a single-family home with an accessory dwelling unit. Elliott testified that the definition of an accessory dwelling unit is "additional living quarters that are independent and smaller than the primary dwelling unit. The spaces are often self-contained with their own entrance[s], and they typically have their own kitchens and bath[s]." Elliott testified that accessory dwelling units can differ from duplexes "in terms of design and legal treatment," stating "a duplex typically offers two roughly equivalent dwellings within a single building * * * whereas an [accessory dwelling unit] is usually significantly smaller and less prominent architecturally than the primary dwelling." Deskin testified that the difference between a duplex and a single-family residence with an accessory dwelling unit is "purely semantics." Elliott testified that all four elements of the highest and best use test are met by a single-family residential home with an accessory dwelling unit.

Deskin testified that he found no definition "for an accessory dwelling unit in conformity with a single-family residence" in the *Dictionary of Real Estate Appraisal, Third Edition*. Deskin testified that it is "all lumped under the category of duplex," which is "a house containing two separate dwelling units side-by-side, or one above the other; it also describes apartments that

occupy two levels or a portion of." Deskin testified that having the subject property as a "single-family residence with an accessory dwelling unit goes against everything that the RH high-density residential zone is about." Deskin testified that his "opinion of highest and best use is predicated on the RH zoning and most probable use of the property * * *." (*See* Ptf's Ex 2 at 11.) When asked if there were any single-family residences with accessory dwelling units in immediate proximity to the subject property, Deskin replied that, "to my knowledge, there were none existent in this neighborhood and everything in the area is of the high density, multi-family dwelling unit category."

Elliott testified that an investor's "primary motivation is to generate income on a property" and "[o]ften, income-producing properties are maintained at minimum levels." Elliott testified that in his career, he has "never seen anything of the quality" of the subject property's "owner-occupied area used by a rental investor." In reference to rental properties, Elliott testified that he "often finds that interior amenities generally are of lower quality and maintained with lower quality materials to maximize return. This is not the case with the subject property." He testified that "[w]ith tenants, these amenities would be more likely to become worn, damaged, altered, or destroyed, and ultimately diminish the overall intrinsic historical value of the home. In my opinion, no investor could charge enough rent for such risk." Deskin testified that the quality of materials used does not "exclude a structure from being a duplex," and that units in a duplex can be of "varying sizes, they do not have to be equal in size." In response, Elliott testified that he was aware of duplexes with units of unequal size, but "they are of very low quality."

/ / /

/ / /

B.    *Plaintiff's Report*

Deskin testified that he inspected the subject property and did "drive-by exterior inspections" of all his comparable properties.  Deskin testified that five of his comparable properties were "zoned RH" and one comparable property was "zoned R5."[1]  (*See* Ptf's Ex 2 at 42-47.)  Deskin testified that all his comparable properties were located within one mile of the subject property.  (*See id.* at 9.)  Deskin testified that his comparable properties were the "same type of building" as the subject property.  Deskin testified that he relied on the comparable properties selected by Swartz and did not make any adjustments.  (*See id.* at 5, 8.)  In response to Dayton's questions, Deskin responded that Swartz used the same adjustments as Elliott did for market extraction, price, contributory value, and square foot of gross livable area.  Deskin testified that he concurred with Swartz's report that the subject property's real market value as of the assessment date was $740,000.

Dayton cross-examined Deskin about the extraordinary assumptions in Deskin's report.  Dayton pointed out that Deskin's review extends items from Swartz's report "by the use of an extraordinary assumption," but failed to specifically list each extraordinary assumption.  (*Id.* at 6.)  Deskin agreed that he did make extraordinary assumptions, but did not list each extraordinary assumption in his report; he stated that an extraordinary assumption is "something that you presume to be true and it must have a reasonable possibility of occurring."  In response to questions, Deskin testified that he saw typographical errors in Swartz's report but those "minor" errors did not affect his determination of real market value.  (*See id.* at 3.)

/ / /

/ / /

---

[1] Plaintiff's report stated that "[t]he 'R-5' zoning classification allows for one dwelling unit per 5,000 sq. ft. of site." (Ptf's Ex 2 at 11.)

C.      *Defendant's Appraisal Report*

Elliott testified that he considered the "sales, cost, and income" approaches to determine the subject property's real market value. Elliott testified that he used the market [sales] approach. Elliott testified that he found five comparable properties and "all except one" were within one mile of the subject property. Elliott stated that all comparable properties selected were owner-occupied homes with accessory dwelling units. Elliott testified that he made adjustments for differences in "site sizes, gross living area, parking spaces, and below grade area." Elliott testified that he did a complete interior and exterior inspection of the subject property and drove by his comparable properties. Elliott testified that at the time of his inspection, the subject property was in the same condition as it was on the assessment date. Elliott testified that his final opinion of the subject property's real market value is $1,300,000 for the 2013-14 tax year.[2]

Deskin testified that the comparable properties selected by Elliott were located in "old Portland established residential neighborhoods." Deskin testified that all of the comparable properties that Elliott selected were not "zoned RH," but rather were "zoned R5 and R7." Deskin testified that the zoning makes a difference because "it is the objective of the City of Portland and the planning department for high-density residential zoning to be a use in this neighborhood." Elliott testified that his comparable properties were located in the same neighborhood as the subject property, "but with different zoning." Elliott further testified that "not every potential buyer is going to check the zoning of a property." Elliott testified that the county has the subject property listed as a single-family residential home even though he

---

[2] Elliott testified that the reference to the 2014-15 tax year in his appraisal report was a typographical error.

acknowledged that the subject property has been approved for a triplex and its current use is as a duplex.

Elliott testified that "median prices of multi-family income properties with two-to-four-units are significantly lower than properties that are single-family residential with an accessory dwelling unit. Median sale prices of two-to-four[-unit] properties were at" $640,900 "compared to the median price of $1,034,500 for single-family residential homes with an accessory dwelling unit." In response to questions, Elliott testified that he would not compare the subject property to two-to-four-unit properties because it is a single-family residence with an accessory dwelling unit. Elliott testified that he "would not even compare this house" to a "duplex, due to the high quality materials."

## II. ANALYSIS

The issue before the court is the subject property's real market value as of the assessment date for the 2013-14 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[3] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2013-14 tax year was January 1, 2013. *See* ORS 308.007; ORS 308.210.

/ / /

---

[3] The court's references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). Plaintiff must present the greater weight of evidence to support its requested real market value reduction. Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

A.      *Highest and Best Use*

Highest and best use is "[t]he first question that must be addressed in a credible appraisal * * *." *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013) (citing *Freedom Fed. Savings and Loan v. Dept. of Rev.*, 310 Or 723, 801 P2d 809 (1990)). Plaintiff alleged that the highest and best use on January 1, 2013, was as a duplex, or multi-family residence. Defendant alleged that the highest and best use at the assessment date was as a single-family residence with an accessory dwelling unit.

" 'Highest and best use' means the reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible, and that results in the highest value." OAR 150-308.205-(A)(1)(e). Plaintiff asserted that a multi-family residence meets the four criteria for highest and best use: "legal permissibility, physical possibility, financial feasibility and maximum profitability." (Ptf's Ex 2 at 11.) Plaintiff presented evidence that legal permissibility is met by the current zoning, physical possibility is met by "the lot size, shape and land to building ratio[,]" and the financial feasibility and maximum profitability are met by the "market conditions at the time of the report * * *."

(*Id.*) Defendant asserted that a single-family residence with an accessory dwelling unit meets the same four criteria for highest and best use.

In the matter before the court, the label "duplex" or "single-family residence with an accessory dwelling unit" does not make a difference in determining the highest and best use. Both parties agreed that the subject property is owner occupied with a paying tenant. The subject property differs from a typical single-family residence because a single-family residence does not generate an income stream. No matter which label is selected, the subject property is generating income from a tenant and is a multi-family residence.

The evidence supports a conclusion that the highest and best use of the subject property on January 1, 2013, was as a multi-family residence. The subject property is located in an RH zone among other multi-family residences. The court finds that an income-producing multi-family residence, whether labeled a duplex or a single-family residence with an accessory dwelling unit, is a reasonably probable and legal use of the subject property and will result in the highest value.

B.      *Approaches of Valuation – Real Market Value*

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *[.]" ORS 308.205(2). There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); OAR 150-308.205-(A)(2)(a). "The [real market] value of property is ultimately a question of fact[.]" *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001). "Competent evidence [of real market value] includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and

testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7, WL 879285 (Mar 13, 2012).

Plaintiff discussed the sales comparison approach, but failed to present evidence that it had considered all three approaches to valuation. Deskin reviewed Swartz's report that had used the sales comparison approach. (*See* Ptf's Ex 2 at 3-7.) Swartz did not testify and none of the information contained in Swartz's report was substantiated.

Plaintiff did not submit a complete appraisal report of the subject property. Deskin's report was a limited review of Swartz's report. Deskin failed to present evidence of "sales adjusted for time, location, size, quality, and other distinguishing differences." *Danielson*, TC-MD 110300D at 7. Deskin relied on adjusted sales from Swartz's report through the use of an extraordinary assumption, but failed to include the specific adjustments made to those comparable properties. Deskin testified that Swartz and Elliott used the same adjustments on their respective comparable properties, but Deskin did not submit any evidence to substantiate the adjustments Swartz made to her comparable properties.

Plaintiff did provide "testimony from licensed professionals such as appraisers" in the form of Deskin's testimony. *Id*. Much of Deskin's testimony related to Swartz's report and his limited review of that report. The court places the appropriate weight on Deskin's testimony of the work he performed and no weight on Deskin's testimony about Swartz's report because Swartz's report was unsubstantiated.

Plaintiff's evidence in support of its requested real market value reduction is inconclusive because Plaintiff did not submit a complete appraisal report or comparable sales analysis. When the "evidence [] is inconclusive or unpersuasive, the taxpayer will have failed to meet [its]

burden of proof * * *." *Reed*, 310 Or at 265. Unfortunately, Plaintiff failed to carry its burden of proof.

Even though Plaintiff failed to carry its burden of proof and the "burden of going forward with the evidence" has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.427; ORS 305.412.

Because Defendant failed to successfully offer into evidence its Exhibit A, the court does not consider the materials contained in that exhibit in the analysis below. Instead, the court examines the trial testimony provided by Defendant's expert witness, Elliott.

Even though Defendant determined the highest and best use of the subject property was a single-family residence with an accessory dwelling unit, Defendant presented no evidence of any single-family residences with accessory dwelling units in immediate proximity to the subject property. Highest and best use "affects what other properties may be considered comparable, a fundamentally important question when selecting so called 'comparable' sales * * *." *Hewlett-Packard*, 21 OTR at 188. In this case, zoning is an important factor to consider. The neighborhood characteristics of a single-family zone are substantially different from that of a multi-family zone. Properties located in single-family residential zones are not the most comparable to the subject property, which is located in a multi-family residential zone. Plaintiff presented undisputed evidence that the subject property is zoned RH and is in a neighborhood comprised of multi-family residences including a four-plex, a high-rise, and a large multi-family complex. Deskin testified that all of Elliott's comparable properties were zoned for single-family residential use and Defendant presented no testimony or evidence to rebut Deskin's

/ / /

testimony. Elliott submitted no evidence of adjustments made to his comparable properties for a difference in zoning.

Elliott considered all three approaches to valuation, concluding that the subject property's real market value is best determined by the sales comparison approach. Elliott testified that all of the comparable properties selected were owner-occupied single-family residences with accessory dwelling units. Deskin rebutted Elliott's testimony, testifying that only two of Elliott's five comparables had accessory dwelling units. Elliott did not provide any evidence of how many of the comparable properties' accessory dwelling units were producing income. This information is important because the subject property had an income-producing unit at the time of the assessment. If Elliott's comparable properties did not have income-producing units, then they are not comparable to the subject property. Defendant failed to submit sufficient evidence for the court to conclude that Elliott's comparable sales analysis included all applicable adjustments.

Elliott's testimony that the subject property is not a multi-family residence because it includes the use of high-quality materials and has unequal size of living space for the occupants is unpersuasive. The real market value of a property can be determined based on many characteristics including amenities and size that are properly adjusted. Elliott failed to properly adjust properties he selected for the comparable sales approach to determine the subject property's real market value.

### III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. Defendant did not provide sufficient evidence of comparable sales to support its determination of real market value using the comparable sales approach. The

court accepts the Multnomah County Board of Property Tax Appeals determination of the

2013-14 real market value for Account R193328. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of May 2015.


JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Presiding Magistrate Jill A. Tanner on May 18, 2015. The court filed and entered this document on May 18, 2015.*