IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

McGRATH'S PUBLIC FISH HOUSE,        )
                                    )
            Plaintiff,              )        TC-MD 200092R
                                    )
      v.                            )
                                    )
MARION COUNTY ASSESSOR,             )
                                    )
            Defendant.              )        **DECISION**

Plaintiff appealed a Real Property Order from the Marion County Board of Property Tax Appeals, dated February 28, 2020, that sustained Defendant's tax roll value of $2,809,560 for the 2019-20 tax year. A trial was held remotely by Webex. Alex C. Robinson, CKR Law Group, appeared on behalf of Plaintiff. Katherine Powell Banz (Banz) testified on behalf of Plaintiff. Scott A. Norris, Assistant County Counsel, appeared on behalf of Defendant. Craig Farnstrom (Farnstrom) testified on behalf of Defendant. Plaintiff's Exhibits 1 and 2 and Defendant's Exhibit A were received into evidence without objection.

## I. STATEMENT OF FACTS

The subject property is a 0.56-acre site with an 8,205-square-foot improvement, constructed in 2001, and operating as a full-service restaurant with a sit-down bar area known as McGrath's Fish House, in Salem, Oregon. The restaurant was custom built in 2001 for Plaintiff and has operated continuously. The subject property is located in the Willamette Town Center, a multi-tenant mall on Center Street between Interstate 5 and Lancaster Blvd., a major regional corridor. The mall was purchased in 2017 and has undergone a re-branding with the current owners changing it from an interior mall to an exterior one.

/ / /

A.   *Plaintiff's Evidence*

Banz testified that she is a MAI certified general real estate appraiser with 18 years' experience and an owner of Powell Banz Valuation.  Banz prepared a retroactive appraisal of the subject property as of January 1, 2019.  Banz testified that commercial activity around the subject property has been stagnant with both decreased rents and decreased vacancy.  Banz reviewed statistics from Co-Star and found 239 restaurant properties in the Salem-Kaiser area with an average restaurant size just over 4,000 square feet.  She spoke with local brokers who indicated that it would be difficult to find a buyer for the property given its size, physical obsolescence, and a trend of consumer preferences away from formal sit-down dining.  Based on the Co-Star data and information from brokers, Banz determined that the large size of the subject property would be a detriment to its sale or lease.

Banz began by considering the subject property's site value; after reviewing comparable land sales, she concluded the subject property's site value was $440,000.  Banz then analyzed the "highest and best use" of the property, before considering three approaches to value—the sales comparison, income, and cost approaches.  She rejected the cost approach due to the age of the property and put most weight on the income approach with secondary weight on the sales comparison approach.

1.   *Highest and best use*

Banz focused on Co-Star's data showing the subject property was more than twice the average restaurant size in the area.  She interviewed local market participants who noted a lack of new construction or restaurant leasing in the area.  Brokers observed a skittishness towards leasing to local and less credit-worthy tenants and a trend toward smaller buildings.  Banz found that, nationally, the restaurant industry was seeing changes in consumer preferences towards fast

food and away from sit-down restaurants. Banz described Plaintiff's history of expansion from a single restaurant to a regional restaurant with 21 locations, to its bankruptcy, and eventual downsizing to three remaining locations, as matching the trends noted above. She stated that "the large size of the building would either necessitate demising if vacated, and/or a low lease rate in order to entice potential tenant(s)." Banz said that high maintenance costs and wages decreased profitability of full-service restaurants, which led her to consider whether the highest and best use might be to demise the space into two restaurants. However, Banz determined the cost to demise the building would be $950,000, which was excessive in relation to her estimated value of the building, and thus Banz concluded the existing restaurant represented the highest and best use of the subject property.

2.      *Income approach*

Banz considered the improvement value, using rental properties with qualities similar to the subject property's to estimate potential gross income. Banz selected seven comparable properties with leases ranging from a high of $24.96 per square foot to a low of $7.09 per square foot. Comparable 1 is a "confidential" lease of a "free-standing restaurant/bar" within a few blocks of the subject property. Banz testified that the landlord's $100,000 tenant improvements made its $24.96 per square foot per year lease a high indicator of value. Comparable 2 is a 2018 triple net lease of an 8,356-square-foot Red Lobster restaurant and bar located near the subject property. Banz testified that she did not place much weight on the lease at $23.17 per square foot because the lessee is a "national credit tenant." She found this comparable was a "high indicator" because "[t]he national tenancy [ ] places upward pressure on the lease rate." Comparable 3 is a 2019 lease of Masonry Bar & Grill, consisting of 4,241 square feet in downtown Salem. Banz testified that the large landlord contribution of $100,000 made the lease

rate of $23.84 per square foot a high indicator of the subject property's value. Comparable 4 is a "confidential" July 2017 lease of a 7,044 square foot restaurant in Salem. Banz testified that the location and exposure were inferior and the lease rate of $10.76 per square foot was a low indicator of value. Comparable 5 is the 2018 lease of Shotski's Pizza, a 5,880-square-foot restaurant/bar along State Street near Willamette University. Banz found the comparable was a low indicator of value because of the location, parking access, and condition. Comparable 6 consists of two restaurants on a single pad in a small shopping center in South Salem. Banz chose these leases because although they are small, they represented what the rental value of the subject property would be if the property were divided into two restaurants. Banz found the 2018 rental rates of $15 and $17.59 per square foot respectively represented a reasonable to high indicator of value. Comparable 7 is a 2018 lease of a 7,030-square-foot restaurant/lounge along Hawthorne Avenue in NE Salem. The restaurant was built in 1961 and despite its ample parking, the location, access, exposure, and condition are inferior, making the $7.09 per square foot lease a low indicator of value.

Banz determined the lease value of the subject property by bracketing Comparable 2 (Red Lobster) and 4 (a confidential property) to narrow the range of lease value to between $10.76 and $23.17 per square foot. Falling within that same bracket was Comparable 6 with two smaller restaurants. Using a value on the lower end of Comparable 6's lease rates, Banz found the probable rent to be $15 per square foot. Banz multiplied that figure by the subject property's size and found potential gross income of $123,075 per year. She deducted 5 percent for vacancy and credit loss, operating expenses, estimated to be 4 percent for management, and 5 percent for reserves and replacement. After deductions, Banz determined the net operating income to be $106,398, or $12.97 per square foot. Finally, Banz divided the net operating income by a

capitalization rate of 6.85 percent to conclude to a value of $1,555,000 under the income approach.

3.    *Sales comparison approach*

For the sales comparison approach, Banz selected five recent commercial property sales. Comparable 1 is the June 2018 sale of a 4,612-square-foot former grill in Keizer purchased by a church at $260.19 per square foot and converted to administrative purposes. Banz considered the parking, condition, and smaller size all superior to the subject property making this comparable a high indicator of value. Comparable 2 is the July 2018 sale of the former Don Miguel Mexican restaurant located in NE Salem for $153.90 per square foot. The 2,924-square-foot restaurant was constructed in 1920, and Banz found the location, condition, and quality were inferior to the subject property making it a low indicator of value. Comparable 3 is the February 2019 sale of a former Murphy's Grill, a 5,595-square-foot restaurant in Dallas, Oregon for $250.22 per square foot. The purchaser converted the building to office use. Banz found the small size made it a high indicator of value. Comparable 4 is the September 2019 sale of a 5,928-square-foot restaurant originally constructed as a Marie Calendar's that was converted to a market and restaurant. Banz considered the $202.43 per square foot sales price a low indicator of value because of its inferior condition and quality. Comparable 5 is the December 2019 sale of a 10,023-square-foot restaurant operated as a Black Angus Steakhouse, located just off Interstate 5 in Vancouver, Washington. Banz selected the property because of its Portland MSA[1] location and found its $279.36 per square foot price a high indicator of value. Banz bracketed comparables 3 and 4 and found a rounded value of $205 per square foot, computing to a value of $1,680,000 under the sales comparison approach.

---

[1] Metropolitan Service Area.

4.      *Plaintiff's conclusions*

Banz combined the two approaches to value, gave primary emphasis on the income capitalization approach because the subject property is an income producing property, and found the ultimate value as of the assessment date to be $1,575,000.

On cross-examination, Banz testified that the appraisal mentioned but did not use as comparables two restaurants located across the street from the subject property, Nagoya and Rock Pizza, because she did not have lease information for either location. She testified that she did not use the restaurant Red Robin, which is located in the same mall as the subject property, because it is operated by a national credit tenant and its inclusion would skew the rental rate higher. Banz testified that she steered away from considering national credit tenants for the appraisal because they are "investor driven" and that Salem as a secondary market does not have many institutional investors.

B.      *Defendant's Evidence*

Farnstrom testified that he has been a senior commercial property appraiser with Defendant for seven years and in the industry since 1991. He testified that the restaurant business was not as bad as presented by Plaintiff and found statistics showing consumers are spending half of their food budget on restaurants. Farnstrom noted that only two retail restaurant buildings in Marion County over 6,000 square feet were vacant as of the assessment date. He stated that although there had been no recent construction of large restaurants in the area, the vacancy rate was low, suggesting the county market was in balance.

Farnstrom first considered the site value by looking at nine sales in the area and determined that the land value for the subject property was $16 per square foot, for a total market value of $389,340. Farnstrom then determined the highest and best use of the property was its

current use as a sit-down restaurant. He prepared a retrospective appraisal as of the assessment date and considered the cost, income, and sales comparison approaches.

1.    *Cost approach*

Farnstrom used the Marshall and Swift cost estimator to find a depreciated cost of improvements totaling $2,410,794. Farnstrom added the depreciated cost to the land component for a rounded value of $2,800,100.

2.    *Income approach*

Farnstrom considered five comparable property leases for the income approach to value.[2] Comparable 1 is the same as Plaintiff's Comparable 2, an 8,407-square-foot restaurant located .35 miles from the subject property. Farnstrom found the building quality to be slightly inferior to the subject property. He determined the lease rate was $22.80 per square foot per year triple-net, with escalations every five years. Comparable 2 is a 6,391-square-foot Red Robin restaurant, also located in the Willamette Town Center. The lease rate is $27.96 per square foot with escalations every five years. Comparable 3 is the Masonry Grill restaurant in downtown Salem, which was also Plaintiff's lease Comparable 3. Farnstrom found the lease rate was $24.72, but unlike Plaintiff, did not consider tenant improvements paid by the landlord. Comparable 4 is a Red Lobster in Medford which leases for $24.72 per square foot. Comparable 5 is the Nagoya Japanese Steak House, located across the street from the subject property. It was formerly the site for Red Robin, which relocated to its current site in Willamette Town Center. The lease rate is $24.96 per square foot.

Farnstrom started with the average rental rate of $25.08, subtracted 5 percent for vacancy and credit loss, then deducted an additional 7 percent for expenses. He then applied a 6.5 percent

---

[2] A sixth property was included in the report "for information purposes only."

capitalization rate, added the land value, and concluded the rounded value for the subject property was $2,805,600.[3]

### 3. *Sales comparison approach*

Farnstrom selected six sales of comparable properties. He found full-service restaurants with similar characteristics to the subject property were scarce in the county and thus included properties from the Portland MSA. Comparable 1 is the November 2016 sale of Red Lobster located .35 miles from the subject. Farnstrom stated the sale "was substantiated by a fee appraisal [at] $3,316,000, or $394 a square foot." Comparable 2 is the April 2018 sale of an Applebee's restaurant in Vancouver, Washington for $2,640,000, or $473 per square foot. Farnstrom adjusted the price for location to $378 per square foot.[4] Farnstrom determined the price was a high indicator of value. Comparable 3 is the February 2017 sale of Denny's in Woodburn, Oregon for $1,800,000 or $292 per square foot. Comparable 4 is the May 2016 sale of a Red Lobster in Vancouver, Washington for $4,782,814 or $534 per square foot. Farnstrom adjusted the price for location to $427 per square foot. Comparable 5 is the September 2016 sale of a Red Robin in Gresham for $2,416,564 or $381 per square foot. Farnstrom adjusted the price for location to $305 per square foot. Comparable 6 is the January 2020 sale of a vacant restaurant formerly operated as a McCormick Seafood restaurant in Beaverton which sold for $3,762,000, or $619 per square foot. Farnstrom adjusted the price for location to $495 per square foot. Farnstrom found the average price of the comparable properties was $382 per square foot to arrive at a concluded value of $3,143,900.

---

[3] Farnstrom testified that his report was in error on the average rental rate, which also changed his conclusion of value.

[4] Farnstrom made a downward location adjustment by 20 percent for properties in the Portland MSA. No data was provided to support this adjustment.

4.    *Defendant's conclusion*

Farnstrom reviewed the three approaches to value and determined the income approach provided the best indicator of value at $2,805,600.

## II. ANALYSIS

At issue is the real market value of a 0.56-acre site containing an 8,205 square foot sit-down restaurant located in a mall near a regional corridor in Salem, Oregon. The parties' positions are closely aligned on several factors: the land-only value of the subject property; a relatively flat market for restaurants over the last few years in the area around the subject property; and for the income approach they used similar hypothetical expenses, vacancy rates, and capitalization rates.

The primary disagreement is Plaintiff's view that the restaurant industry as a whole, and specifically in the Salem area, is on a downward trend, with market preference shifting towards smaller footprints and restaurants with larger footprints becoming more functionally obsolescent. Concurrently, Plaintiff argues that "national credit tenants" tend to have higher lease rates that, if selected as comparable properties, skew values excessively high, and do not reflect local market rents. Defendant argues that the market for stand-alone restaurants in Salem was in balance on the date of assessment with no new construction but also few vacancies. Defendant argues that there should be no adjustments on account of the status of a tenant being a "national credit tenant"—instead, the focus should be on the properties' location and characteristics.

As the party seeking affirmative relief, Plaintiff bears the burden of proof by a preponderance of the evidence. ORS 305.427.[5] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302,

_____

[5] The court's references to the Oregon Revised Statutes (ORS) are to 2017.

312 (1971). Because real market value is the issue, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Highest and Best Use of the Subject Property*

We start with the consideration of the highest and best use of the subject property. Highest and best use is "the reasonably probable use of land * * * that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e). Determining highest and best use "is necessary for establishing real market value," in part because it impacts the selection of comparable sales and leases. OAR 150-308-0240(2)(i); *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013). The highest and best use analysis considers "all possible uses that might result from retaining, altering, or ceasing the integrated nature of the unit of property." OAR 150-308-0240(2)(i).

Defendant's position is simple: the highest and best use of the subject property is the current use as a sit-down restaurant. Plaintiff's conclusion of highest and best use is less coherent. Banz began by analyzing whether the highest and best use was to demise the property into two units in order to "entice potential tenant(s)," but ultimately concluded that the high cost of demising the property outweighed the profitability of the subject property's existing use. Despite this determination at the beginning of the appraisal, Banz's comparable sales selections and later testimony suggest lingering reservations about that conclusion. Banz's income approach Comparable 6 (two smaller restaurants) is an example of that internal conflict, as are sales comparables 1 and 3, both of which were converted from restaurant to office space.

/ / /

The subject property, located in a regional mall, is in a highly visible location near a regional corridor. It is unlikely that the subject property would be converted to office space or demised into two retail spaces. Despite a smaller average restaurant size in the area, the evidence does not persuasively show that regression to the mean building size is appropriate. The court is persuaded that the highest and best use of the subject property is its historical and current use as a stand-alone, sit-down restaurant.

B.      *Choosing the Best Method for Determining Value*

Real market value "means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205. The assessment date for the 2019-20 tax year is January 1, 2019. ORS 308.007; ORS 308.210. Real market value is determined in accordance with rules adopted by the Department of Revenue. ORS 308.205(2). The rules require three approaches to value be considered: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308-0240(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id*.

Here, both parties relied primarily on the income approach and secondarily on the sales comparison approach, but Defendant also considered the cost approach. Testimony from both witnesses indicate that the subject property would most likely be purchased by an investor who would focus on the return on investment. Potential investors would not likely take into consideration the cost approach or place much weight on the sales comparison approach. Accordingly, the court finds the income approach is the best method to determine the value of the subject property.

C.    *Income Approach*

Here the parties used the direct capitalization method which starts with selecting appropriate market lease comparables, determining the gross operating income, subtracting certain hypothetical expenses, and dividing the net operating income by an overall capitalization rate. The parties are reasonably close in their determination of the hypothetical expenses and capitalization rate; they primarily differ on the selection of lease comparables to establish the gross operating income.

1.    *National credit tenants*

A primary difference between the parties in selecting lease comparables revolves around Plaintiff's theory that national credit tenants pay higher rents than local tenants, and that selecting those leases as comparables would unfairly skew average rents higher. That theory is reflected in the leases selected by Plaintiff, only one of which was a national credit tenant, and the weight that lease was given. Defendant argues that the type of entity leasing a property should be ignored for the purpose of selecting comparables, and only the intrinsic property qualities should be considered. There may be unique properties in existence for which a limited type of individual or entity, such as national credit tenants, would be potential lessors, and it is possible that the value of such a property would be affected by the characteristics of that limited pool of potential lessors. However, the evidence presented does not demonstrate that the subject is that type of unique property. The court believes that Plaintiff errs by conflating correlation with causation. There is a correlation between national credit tenants and higher rents—that is plain to see in the data presented by the parties. But the data also shows a correlation between higher lease rates and superior locations. The court does not accept the premise that national credit tenants, and their superior credit, will in every case be the cause of higher rents at a

specific property; the correlation could just as easily have other explanations, for example, national credit tenants may tend to have preferences for properties with superior locations or features. Properties whose locations and amenities are similar to the subject property should be considered and the status of the lessees as "national credit tenants" versus another kind of tenant is less important to the type of valuation under consideration here.

2.      *Comparable properties*

Plaintiff's selection of confidential leases (Comparables 1 and 4) does not provide the court with enough evidence to accurately assess their comparability. The court is also not convinced that a property demised into two smaller restaurants in an inferior location, or a very old restaurant down the street from the subject property (Comparables 6 and 7) are similar enough to the subject to be comparable at all. However, the remaining selections, Comparables 2 and 3, are similar enough to the subject property to be appropriate comparables. However, these two comparables, also used by Defendant, suggest a higher rent per square foot than Banz's proposed $15 per square foot, and closer to Defendant's estimate of value for the subject property.

Defendant argues that their lease comparables are superior to Plaintiff's selection and the court generally agrees. However, Plaintiff's criticism of certain aspects of its appraisal are well taken; applying a 20 percent location discount for Portland MSA properties is unsupported by any data. Additionally, the court agrees that at least two of Defendant's selections should have been adjusted for significant landlord improvements. Even adjusting for those factors, Defendant's opinion of value at $2,805,600 falls within a narrow range of value and is consistent with the value found by BOPTA.

/ / /

D.   *Sales Comparison Approach*

Plaintiff's selections in the sales comparison approach are similarly inferior to the subject property.  Several of the comparables are for properties converted from restaurant use to office use, and Plaintiff bracketed the subject property between two of those converted properties.  The subject property, located in a mall on a major corridor, is unlikely to be converted from its existing use to office use.

The court finds the types of businesses selected in Defendant's sales comparables better reflect the features and characteristics of the subject property but not necessarily their locations.  Five out of the six properties selected were outside the subject property's MSA.  Farnstrom's 20 percent location adjustment was not supported by any data.  The court finds Defendant's sales comparison approach evidence to be unpersuasive.

E.   *Real market value conclusions*

Ultimately, the court is not persuaded by Plaintiff's evidence of value for the subject property.  The court finds Defendant's evidence of the value, and its ultimate valuation, primarily using the income approach, at $2,805,600, to be more persuasive.  Because Defendant's determination of value falls within a narrow range around the value determined by BOPTA, it is unnecessary to calculate the exact value, as there would be no appreciable adjustment to the real market value or property tax.

III.  CONCLUSION

It is Plaintiff's burden to prove the value is lower than the tax roll.  ORS 305.427.  Plaintiff has not met their burden of proof.  Now, therefore,

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of April 2022.

_____
RICHARD DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on April 20, 2022.*