IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MACY'S DEPARTMENT STORES, INC., )
)
   Plaintiff, ) TC-MD 180139G
)
 v. )
)
CLACKAMAS COUNTY ASSESSOR, )
)
   Defendant. ) **DECISION**

  This is one of two 2017–18 valuation appeals of Plaintiff's department store properties at the Clackamas Town Center. The two cases were tried together. The subject of TC–MD 180139G is the account containing the main Macy's store (Main Store); the subject of TC–MD 180138G is the account containing the Macy's Home store (Home Store). Cynthia Fraser, attorney, appeared on behalf of Plaintiff, and Jay F. Booth, MAI, testified on behalf of Plaintiff. Kathleen J. Rastetter, attorney, appeared on behalf of Defendant, and Ronald R. Saunders, appraiser, testified on behalf of Defendant.

  Because of overlapping evidence, this decision presents the court's analyses of both appeals. Because the two appraisers disagreed about the extent to which differences between the subjects warranted different treatment, each store will be discussed separately where appropriate. For the convenience of the readers, the two decisions in these cases are identical up until the conclusion.

  Plaintiff submitted two sets of exhibits, one for each case, and Defendant submitted one set of exhibits for both cases. Two sets each of Plaintiff's Exhibits 1, 4, 8, 10, and 12 were admitted, page 10 of Plaintiff's Exhibit 14 was admitted, and Plaintiff's Exhibit 15 was admitted. Defendant's Exhibits A, B, C, E, F, G, and H were admitted. Plaintiff's numbered exhibits were

generally identical between the two cases, except that each store received a separate appraisal labeled Exhibit 1. The two Exhibits 1 contained much similar information, and at trial Plaintiffs relied on the appraisal of the Main Store for information common to both subjects. The court will refer to the appraisal submitted for TC–MD 180139G as Exhibit 1M and will cite to it for information common to both appeals and specific to the Main Store appeal. The court will refer to the appraisal submitted for TC–MD 180138G as Exhibit 1H and will cite to it for information specific to the Home Store appeal.

## I. STATEMENT OF FACTS

A. *Overview*

The two subjects are large, multilevel department store buildings with adjacent parking lots. Together they are two of the five anchors of the Clackamas Town Center, a super-regional mall near Happy Valley. (Ex 1M at 3; A at 16.) Historically, shopping malls such as Clackamas Town Center were developed in conjunction with department-store retailers, who acquired land and built large department stores as "anchors" that would attract shoppers. The mall owner would connect the anchors with concourses lined with shops, which benefitted from the increased traffic generated by the anchors.

In recent years, many department-store retailers have consolidated their real estate holdings in response to shifts in customer preferences. The chief trends identified are the increasing share of shopping done online—a trend which impacts both department stores and malls in general—and competition from discount and "big-box" retailers. Some discount retailers, such as Kohl's, may operate out of department-store space. Others, such as Target and ShopKo, operate big-box stores. Big-box stores are fairly large single-story buildings that are either freestanding or located within a "power center" consisting predominantly of big-box

stores. Other than discount retailers, big-box retailers include "category specialists" that focus on a single merchandising line, such as home improvement, pets, or sporting goods. Although big-box stores are big, their typical floorplate is considerably smaller than either of the subjects'.

In several cases, mall owners and investors have reconfigured vacant department store buildings for multiple tenants and for big-box retailers.[1] Such reconfigurations involve closing up escalators, adding additional utility hookups, and creating separate entrances for multiple tenants. The amount of leasable space is typically reduced because separate entrances require extending the mall concourse into portions of the former department store. Total capital expenditures may run $100 to $200 per square foot of repurposed space. Rental rates for repurposed department-store space are considerably higher; in 2017, the average rental rates of former Sears stores had risen from $4.40 to $18.55 per square foot upon redevelopment. (Ex C at 1.)

As mentioned above, the stores at issue here are large.[2] The Main Store has two levels and a gross leasable area of 199,436 square feet on a 15.11-acre site with ample parking. (Ex A at 8; Ex 1M at 3, 62, 67.) Each of its levels has an interior entrance to the mall; its upper level has two exterior entrances and its lower level has one exterior entrance. (Ex 1M at 67–8; Ex A at 13–15.) The Home Store has two large sales-floor levels and a smaller third level with offices. (Ex 1H at 66–68.) Its gross leasable area is 168,693 square feet, and it is situated on a 10.17-acre site with ample parking. (Ex 1H at 62, 69–70; Ex A at 6, 42.) The Home Store has an interior mall entrance on each of the sales-floor levels, a single exterior entrance on its upper level, and

---

[1] Examples of Portland-area department stores that have undergone such repurposing are former Nordstroms at the Lloyd Center and the Vancouver Mall, as well as a former Macy's downtown. (Ex 1M at 42.)

[2] Slight differences in the parties' reported acreages and gross leasable areas do not affect the final values. In the absence of other evidence of size, the court adopts the larger value in each instance as being least favorable to the party bearing the burden of proof.

no exterior entrance on its lower level. The Main Store is located on the side of the mall facing the most-travelled access road, whereas the Home Store is located on the opposite side. Both stores were constructed in 1980 or 1981 and have since been maintained and renovated; they are of average condition and quality. (Ex 1M at 67; Ex 1H at 69–70; Ex A at 8, 46–47, 70.)

B.      *Procedural History*

Following assessment by Defendant and appeal by Plaintiff to the board of property tax appeals (BOPTA), the tax-roll real market value of the Main Store was reduced to $23,629,000 and that of the Home Store to $17,766,000. Plaintiff has appealed to this court from BOPTA's orders. Plaintiff's request, as amended to conform to its evidence at trial, is for values of $15,800,000 for the Main Store and $10,500,000 for the Home Store. (Ex 1M at 112; Ex 1H at 115.) Considering its Answer as amended to conform to its evidence, Defendant concedes a reduction of the Main Store's value to $21,224,543 and requests an increase in the Home Store's value to $17,952,800. (Ex A at 78.)

C.      *Valuation Evidence*

Both appraisers developed valuations using the sales comparison and income capitalization approaches, having considered the cost approach and found it unsuitable to the subjects.

The appraisers agreed that each subject's highest and best use remains its current use as a single-tenant anchor department store. (Ex 1M at 77; Ex 1H at 79; Ex A at 55.) Despite contrary trends in the department-store industry, the retail market in the subjects' area was strong and Clackamas Town Center was expected to continue attracting shoppers because of its "location, accessibility, tenant mix, anchor alignment, appearance, and merchandising[.]" (Ex 1M at 60–61.) Plaintiff's appraiser testified that most department stores, including the subjects,

are candidates for redevelopment, and that eventually all department stores will be repurposed to some extent.

Each appraiser applied a single set of rent comparables and a single set of sales comparables to both subjects. They disagreed over whether differences in the subjects warranted different adjustments to the comparables; Plaintiff's appraiser held that they did, Defendant's that they did not.

None of the appraisers' comparables—either sales or rents—were similar enough to complete a paired-sale analysis. (Ex 1M at 78, 91.) Therefore, adjustments were qualitative rather than quantitative. (*Id*. at 85.) Plaintiff's appraiser assigned percentages to his qualitative adjustments showing their relative impact and determined adjusted values for each comparable. Defendant's appraiser described all his adjustments as "subjective in nature." (Ex A at 58.) In his narrative for each comparable, he listed factors that would require adjustment and concluded only to whether that comparable's value was higher or lower in relation to the subjects.

1.      *Income Capitalization Approach*

Both appraisers used the direct capitalization method. According to Plaintiff's appraiser, this was because the subjects' operations were stabilized and there was adequate support for a capitalization rate from recent market transactions and current survey data. (Ex 1M at 87.) In his opinion, a prospective purchaser would use direct capitalization as "the primary tool in evaluating the property." (*Id*.)

a.      Market Rent

Plaintiff's appraiser selected rent comparables that were (1) department stores rather than big-box stores, (2) at least two levels, and (3) located at regional malls rather than freestanding or in power centers, with one exception for a department store at an outdoor lifestyle center. In

order to meet those criteria, he ventured afield. Geographically, his closest rent comparable was in California; the other five were in Texas, Florida, New Jersey, and Maine. (Ex 1M at 88.) He testified that he and members of his firm had analyzed the leases and regional market conditions surrounding each transaction to ensure the leases were in fact comparable. His comparables ranged in size from 120,844 square feet to 212,721 square feet, with rents of $2.36 to $6.15 per square foot. (*Id.*)

Defendant's appraiser testified that he preferred nearer comparables because he had inadequate information about markets in other regions of the country. Half of his eight comparables were in Oregon: two discount department stores (one in a small shopping center, one freestanding); a big-box store at a power center; and a grocery store. (Ex A at 59.) His other four comparables were located in Washington, California, and Montana: two big-box stores (one in a power center, one freestanding); a discount department store in a regional mall; and an anchor department store in a regional mall. (*Id.*) His comparables ranged in size from 58,093 to 132,633 square feet, with rents of $7.38 to $12.00 per square foot. (*Id.*)

Plaintiff's appraiser testified that the Home Store's location in the rear of the mall and its lack of a lower-level exterior entrance compared less favorably than the Main Store because those features reduced its exposure and limited its potential for future redevelopment. Defendant's appraiser testified that any reduction in exposure from being in the rear of the mall was offset by the Home Store's prominence within the mall's front entrance, and that future redevelopment was not relevant to its current highest and best use.

Although Plaintiff's appraiser applied different adjustments to the Home Store and the Main Store, the details of those differences are not in evidence because the chart for his Main Store adjustments was mistakenly placed in both of his appraisal reports. (*Compare* Ex 1M at 89 *with*

Ex 1H at 91.) That chart shows a 3 percent annual time trend for market conditions, as well as adjustments for location, size, quality, and—in one case—"other" ranging from 5 to 20 percent, with gross overall adjustments ranging from 10 to 35 percent. (*Id.*) According to testimony, the 15-percent "other" adjustment was for one property's being a three-level store and thus harder to rent. The discussion in the Home Store appraisal states that another "other" adjustment was made to account for that subject's inferior location near the rear of the mall. (Ex 1H at 94.) No adjustments were made for age, despite construction dates ranging from 1964 to 2007. Plaintiff's appraiser testified that frequent renovation extends the useful life of well-maintained malls and that his judgment of the malls' effective ages was incorporated into the quality adjustments. Based only on comparables, he concluded a rent per square foot ranging from $4.00 to $6.00 for the Main Store and $3.50 to $5.50 for the Home Store. (Ex 1M at 93; Ex 1H at 95.)

Plaintiff's appraiser also estimated the subjects' market rent using an occupancy cost-to-sales ratio, which he testified was a standard practice within the retail industry. Based on the Main Store's actual sales, he concluded to a rent of $5.75 per square foot, near the high end of the range indicated by his comparables. (Ex 1M at 97.) He did not use actual sales from the Home Store in his analysis because those sales were artificially low "due, in part, to the merchandising mix of the store[.]" (Ex 1H at 98.) He derived a stabilized sales performance figure for the Home Store by averaging the actual sales of the Main Store with those of the Sears store in the Clackamas Town Center. (*Id.*) The stabilized performance figure was $130 in sales per square foot, as opposed to actual sales of around $77 per square foot. (*Id.* at 97–98.) Computing the rent-to-sales ratio from that figure, he concluded to a rent of $4.25 per square foot, in the lower half of the range indicated by the comparables.[3] (*Id.* at 99.)

---

[3] Plaintiff's appraiser acknowledged errors in his occupancy cost calculations, including the use of 2017 sales rather than 2016 sales and current taxes on the roll rather than the reduced taxes Plaintiff seeks. He testified

Reconciling the results of his two analyses, Plaintiff's appraiser concluded to a market rent of $5.75 per square foot for the Main Store and $4.50 per square foot for the Home Store. (Ex 1M at 98; Ex 1H at 100.)

Defendant's appraiser did not tabulate adjustments to his comparables. He applied a two-percent time trend for market conditions, and in his narrative summary he identified the factors that led him to conclude that the subject's market rent would be either higher or lower than the actual rents of each comparable. (Ex A at 58, 65–66.) Besides time, those factors were relative location, exposure, building size, parking ratio, tenant improvement allowances, finished mezzanine, age, and store fixtures. (*Id*.) He ultimately concluded to a market rent "in the lower end of the comparable rental rate range indicated by the lease comparables": $8.00 per square foot, both for the Main Store and for the Home Store. (*Id*. at 66.)

b.      Vacancy and Collection Loss and Annual Operating Expenses

Plaintiff's appraiser testified that analysis of net leased sales showed that vacancy and collection losses were not typically factored into department store appraisals because the leases tended to be long-term with a corporate guarantee. He therefore did not deduct vacancy and collection loss from either subject's potential gross income. He found that the market for department stores also tended to disregard operating expenses, but that in some cases a nominal management fee was charged. (Ex 1M at 98.) To reflect this, he deducted operating expenses equal to 1 percent of effective gross income. (*Id*.)

Defendant's appraiser applied a 3-percent vacancy loss based on a survey of overall vacancy rates within the "Clackamas/Milwaukie retail submarket" in the fourth quarter of 2016. (Ex A at 66–67.) He estimated operating expenses of 4 percent. (*Id*. at 67.)

---

that those errors did not affect his final conclusion as to market rent.

c.    Overall Capitalization Rate

Defendant's appraiser derived an overall capitalization of 7.00 percent for both stores, relying exclusively on leased-fee sales. (Ex A at 67–68.) Plaintiff's appraiser derived overall capitalization rates of 7.25 percent and 7.50 percent for the Main Store and the Home Store from leased-fee sales, an investor survey, and mortgage–equity analysis. (Ex 1M at 103–11; Ex 1H at 106–14.) The difference in capitalization rates derives from the mortgage-equity analysis inputs, which he testified reflected additional risk posed by the Home Store's physical configuration.

Both appraisers' leased-fee comparable sales included discount department stores. Plaintiff's 28 sales included 15 freestanding discount department stores, 8 anchor department stores at malls, and 5 retailers at other shopping centers (one of which was an anchor department store). (Ex 1M at 105.) Defendant's 15 sales included 8 discount department stores—at least five of which were freestanding and two of which were in shopping centers—4 big-box home improvement stores, 2 Walmarts, and 1 department store at a shopping center. (Ex A at 68.) Plaintiff's sales were dispersed throughout the United States; Defendant's were mostly in the Pacific Northwest, with the exception of the Walmarts (in Tennessee and North Carolina) and one of the freestanding discount department stores (in eastern Montana).

Plaintiff's appraiser determined that the leased-fee sales suggested an overall capitalization rate in the range of 6.75 to 7.75 percent—a range slightly larger than the bottom half of the standard deviation from his data's 7.64-percent mean. (*See* Ex 1M at 105.) Defendant's appraiser determined that his data supported an overall capitalization rate of 7 percent, reasoning that the rate should be higher than those of the "recession-proof" home-improvement stores and Walmarts (5.99 percent and 6.62 percent, respectively), lower than that

///

of freestanding discount retailers in less-desirable locations (7.49 percent), and near to that of the shopping-center retailers (7.18 percent).  (Ex A at 68).

Data from the PriceWaterhouseCooper Real Estate Investor Survey showed that average capitalization rates for net-lease properties nationally was 6.75 percent in the fourth quarter of 2016.  (Ex 1M at 105–07.)  The data in evidence was insufficient to calculate the standard deviation.

Plaintiff's appraiser applied mortgage-equity analysis to derive an overall capitalization rate sufficient to justify an equity investor's risk in purchasing the subjects, given prevailing mortgage terms and assumptions about rates of return required by investors and rates of real estate appreciation.  (Ex 1M at 107–10.)  Anticipated risk is embedded in both assumptions.

For the Main Store, Plaintiff's appraiser selected an equity yield rate of 15 percent, "a reflection of current rates of return sought by equity investors[,]" and an annual appreciation rate of 2.50 percent, based on his firm's "view of current market conditions as well as future conditions anticipated during the holding period."  (Ex 1M at 109.)  The overall capitalization rate indicated for the Main Store using those assumptions was 7.19 percent.  (*Id*. at 110.)  For the Home Store, he selected an equity yield rate of 16 percent, with the extra percentage point representing additional risk he perceived in that store's location and lack of a lower-level entrance, and he reduced the projected annual appreciation rate to 2.25 percent for the same reasons.  (Ex 1H at 112.)  The overall capitalization rate indicated for the Home Store using those assumptions was 7.78 percent.  (*Id*. at 113.)

Considering the results of the PriceWaterhouseCooper survey and his analyses of the leased-fee sales and mortgage-equity requirements, Plaintiff's appraiser concluded to overall

/ / /

capitalization rates of 7.25 percent for the Main Store and 7.50 percent for the Home Store. (Ex 1M at 111; Ex 1H at 114.)

d.  Indicated Values under Income Approach

Using a market rent of $5.75 per square foot with 1-percent operating expenses and a 7.25-percent overall capitalization rate, Plaintiff's appraiser concluded to a value for the Main Store under the income approach of $15,650,000, or $78.47 per square foot. (Ex 1M at 111.) For the Home Store, he used a market rent of $4.50 and a 7.50-percent overall capitalization rate, concluding to a value of $10,000,000, or $59.29 per square foot. (Ex 1H at 114.)

Defendant's appraiser used a market rent of $8.00 per square foot, 3-percent vacancy losses, 4-percent operating expenses, and an overall capitalization rate of 7 percent for both subjects. His concluded values were $21,224,543 for the Main Store and $17,952,800 for the Home Store, $106.42 per square foot in each case.

2.  *Sales Comparison Approach*

a.  Plaintiff's Evidence

In selecting comparable sales, Plaintiff's appraiser sought fee-simple sales of multilevel department stores at regional malls. He testified that a fee-simple sale was a better indicator of market value than a sale–leaseback because it isolated the value of the property from negotiations pertaining to the lease. As a consequence of that preference, his sales comparables consisted of properties that were either vacant or had short-term leases remaining.

Plaintiff's appraiser identified five sales, two of which were department stores at Portland's downtown mall, the Lloyd Center. (Ex 1M at 79.) Others included a 383,000-square-foot California department store with an historic designation, a department store in Washington

/ / /

with a lease in place at significantly below market rent, and a vacant department store in Utah purchased for redevelopment to multitenant use. (*Id*.)

Plaintiff's appraiser adjusted the comparables for location, size, land-building ratio, "utility," "economics," and for the historic designation limiting development of one property. (Ex 1M at 80.) The utility adjustment "includes site layout, signage, visibility, etc." (*Id*.) The economics adjustment, which he described as "relatively subjective," was significant in three of his comparables: 20 to 75 percent relative to the Home Store, and 25 to 100 percent relative to the Main Store. (*Id*.; Ex 1H at 82.) His least-adjusted comparable—the Sears at Lloyd Center— had gross adjustments of 20 percent relative to the Main Store and 25 percent relative to the Home Store. (*Id*.) The others had gross adjustments of 65 percent, 35 percent, 40 percent, and 115 percent relative to the Main Store; 60 percent, 45 percent, 45 percent, and 100 percent relative to the Home Store. (*Id*.)

The Sears at Lloyd Center was a three-level, 143,000-square-foot department store in downtown Portland that sold in August 2016 for $80.42 per square foot. Plaintiff's next-best comparable was the 130,000-square-foot former Nordstrom at Lloyd Center, which sold in February 2015 for $57.69 per square foot. Plaintiff's appraiser's respective adjusted prices of those two sales were $81.32 per square foot and $73.27 per square foot relative to the Main Store, $69.12 per square foot and $64.11 per square foot relative to the Home Store. (Ex 1M at 80; Ex 1H at 82.) The 15-percent difference in adjusted prices reflects a 15-percent difference in adjustments for "utility" and "economics" stemming from the Home Store's position in the rear of the mall and lack of a lower-level entrance.

Relying primarily on those two sales, Plaintiff's appraiser concluded to a value range of $75 to $85 per square foot for the Main Store and $60 to $70 per square foot for the Home Store.

(Ex 1M at 85; Ex 1H at 87–88.) Choosing the midpoints of those two ranges, he concluded to values of $15,950,000 for the Main Store and $10,950,000 for the Home Store. (*Id.*)

Defendant's appraiser agreed that the former Nordstrom was comparable to the subjects, admitting that his omission of it from his own sales comparables was a mistake. However, he testified the Sears store was sold in a portfolio with another store in Minnesota. Because of the potential for allocating value between properties in a portfolio sale for reasons unrelated to market value, he concluded the Sears sale was unreliable as an indicator of value.

b.      Defendant's Evidence

Defendant's appraiser selected 7 large, single-user retail stores as comparables, including 5 big-box stores and 2 anchor department stores. (Ex A at 69.) Of the department stores, one was located in a community shopping center in Arizona and the other was located in a regional mall in Virginia, near the District of Columbia. (*Id.* at 71–72.) The Virginia store was converted into a homeless shelter after its sale. (*Id.* at 72.)

The Arizona store sold for $103.45 per square foot, and the Virginia store sold for $112.11 per square foot. (Ex A at 70.) Defendant's appraiser did not attempt to quantify adjustments to any of the comparable sales; he testified that he was unfamiliar with market conditions outside the Pacific Northwest. In his narrative, he indicated features of each property that would lead him to adjust its sale upward, downward, or neither. (*Id.* at 71–72.) He concluded that both the Arizona and Virginia sales approximately reflected the value of the subjects. (*Id.*) Using a per-square-foot value of $108, his comparable sales approach yielded market values of $18,218,884 for the Home Store and $21,539,088 for the Main Store. (*Id.* at 72.)

/ / /

3.    *Reconciliation*

Both parties claimed to place primary weight on the income capitalization approach in their reconciliations, although Plaintiff's appraiser also stated he placed equal weight on both approaches.  (Ex 1M at 112; Ex 1H at 115; Ex A at 78.)  In fact, Plaintiff's appraiser averaged the results of the two approaches, concluding to final values of $79.22 per square foot for the Main Store ($15,800,000) and $62.25 per square foot for the Home Store ($10,500,000).  The sales comparison approach did not affect Defendant's appraiser's conclusion, which was equal to the values indicated by his income approach: $21,224,543 for the Main Store and $17,952,800 for the Home Store.

Additional factual details are introduced below where pertinent to the analysis.

## II.  ANALYSIS

The issues in these cases are the respective real market values (RMVs) of the Main Store and the Home Store.

As always, each party must bear the burden of proof according as that party seeks to have the tax assessment changed—here, to have the tax roll RMVs lowered or raised.  *See* ORS 305.427.[4]  That burden is sustained by "a preponderance of the evidence."  *Id*.  A party meets the preponderance standard when the evidence supporting that party's position outweighs the evidence supporting the other party's position.  *DeGroat v. Dept. of Rev.*, TC 5322, WL 369166 at *2 (Or Tax Jan 29, 2019), *as amended* (Feb 11, 2019).  In valuation cases, this court has jurisdiction to determine RMV based on the evidence presented, "without regard to the values pleaded by the parties."  ORS 305.412.

/ / /

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2013.

A property's RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1). The informed buyer and seller in that hypothetical transaction must be typically motivated, and a financing method typical for the property is treated as equivalent to an "amount in cash." ORS 308.205(2). The property interest purchased in that hypothetical transaction is the fee simple interest—the value of the property irrespective of the actual terms of any leases held on it. *Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 248–49, 445 P3d 297 (2019) (citing *Swan Lake Mldg. Co. v. Dept. of Rev.*, 257 Or 622, 478 P2d 393 (1970), *reh'g den*, 257 Or 622, 480 P2d 713 (1971)).

Determination of RMV is a fact-intensive process subject to legal constraint by statute and administrative rule. *Hewlett-Packard Co. v. Benton County Assessor* (*Hewlett-Packard II*), 357 Or 598, 609–10, 356 P3d 70 (2015) (affirming *Hewlett-Packard Co. v. Benton County Assessor* (*Hewlett-Packard I*), 21 OTR 186 (2013)); *see* ORS 308.205(2). It requires investigation of the three approaches to value: the sales comparison approach, the cost approach, and the income approach. OAR 150-308-0240(2)(a).[5] Where, as here, an appraiser determines one or more approach is not useful for valuing a given property, it need not be developed. *Id*. Where an approach requires analysis of market transactions, those transactions must involve property "comparable to the subject, or adjusted to be comparable[.]" OAR 150-308-0240(2)(c) (so stating with respect to sales comparison approach).

/ / /

/ / /

---

[5] Oregon Administrative Rules (OAR)

A.    *Highest and Best Use*

The benchmark for determining whether a market sale or lease involves comparable property is the highest and best use of the relevant properties. *Hewlett-Packard I*, 21 OTR at 188. A property's highest and best use is its "reasonably probable use * * * that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e). A property's highest and best use is not necessarily its current use; it can be another potential use that might result from "altering[] or ceasing the integrated nature of the unit of property." OAR 150-308-0240(2)(i). Property is valued at its highest and best use because a typically motivated seller will accept the highest offer and "a seller 'can expect to receive the highest offer from a prospective buyer who intends to put the property to its most profitable use." *Hewlett-Packard II*, 357 Or at 602 (quoting *STC Submarine, Inc. v. Dept. of Rev.*, 320 Or 589, 592 n 5, 890 P2d 1370 (1995)).

Here, the appraisers agree that the highest and best use of each subject was its current use as an anchor department store; whatever headwinds confront the department-store industry, the cost of repurposing the subjects was not justified as of the date of valuation. That highest and best use distinguishes the subjects from other retail stores. As department stores, the subjects are distinguished from buildings suited to other retail uses, such as big-box stores, which require a smaller floorplate and a different floorplan. As anchors, the subjects are distinguished from buildings not integrated within a larger shopping center or mall.

Both appraisers attest to the difficulty of locating suitable comparables for the subjects because department stores tend to be owner-occupied for a long time, and the appraisals demonstrate that difficulty. The majority of Defendant's sales and lease comparables were either freestanding, big-box, or both—and one of its lease comparables was grocery store. Plaintiff

fared better in locating department-store comparables in malls. Yet many of its sales comparables were sold for redevelopment, suggesting that their highest and best uses were no longer operation as anchor department stores.

Although Defendant's appraiser put relatively high weight on choosing comparables from Oregon or the West Coast, the evidence does not suggest the market for the subjects was limited geographically.[6] To the contrary, Defendant introduced testimony, which Plaintiff did not rebut, that the Sears at Lloyd Center was purchased in conjunction with a department store in Minnesota. That fact demonstrates the market for properties like the subjects is national. There is no reason why a sale or lease from outside Oregon or the Pacific Northwest could not be comparable, provided it was suitably adjusted.

B.    *Income Capitalization Approach*

Because both appraisers used direct income capitalization, the principal points of dispute are the subjects' market rents and their overall capitalization rates. The court accepts the testimony of Plaintiff's appraiser as to the small importance placed by the department-store market on vacancy and collection losses and operating expenses. That testimony was based on a firsthand knowledge of retail valuation norms not claimed by Defendant's appraiser. It is consistent with the possibility that a property's vacancy rate is lower when stabilized than when non-stabilized. *Cf. Powell Street I*, 22 OTR at 431–38 (accepting evidence of lower vacancy rate for stabilized anchor space than for non-stabilized). Finally, it is against the interest of the party offering the testimony; the testimony of Plaintiff's appraiser is all the more credible because

/ / /

---

[6] For purposes of this analysis, the subjects' "market" is the market of potential purchasers or lessors of the subjects, not the market of potential retail customers within the subjects' geographically defined trade area.

disregarding such losses tended to increase the subjects' value. Therefore, the analysis below focuses only on market rents and capitalization rates.

1. Market Rents

Both parties supported their market rents with rent comparables. In addition, Plaintiff's appraiser provided an occupancy cost-to-sales ratio analysis.

The rent comparables provided by Plaintiff's appraiser comport with the subjects' highest and best use: all six were multilevel anchor department stores, five were located in large malls, and the remaining one was in a large, open-air shopping center in Florida functionally similar to the enclosed malls of harsher climes. In contrast, Defendant's appraiser's eight lease comparables included only one multilevel anchor department store in a regional mall—a Sears store in Modesto, California—and two discount department stores roughly one third of the subjects' size.

Defendant alleged Plaintiff's appraiser had cherry-picked lower-rent comparables. As evidence, Defendant introduced a list of unadjusted comparables Plaintiff had introduced during BOPTA proceedings that included two higher-rent comparables not included in the appraisal. (Ex E at 2.) However, Defendant's appraiser did not include the comparables in question among his own lease comparables, apparently judging them less comparable than big-box stores and a grocery store. Given that neither side's appraiser used the "omitted" comparables in determining market rent, Defendant's allegation of cherry-picking is unsupported. The court accepts Plaintiff's appraiser's explanation that the transactions were just two among many comparables he discarded in performing his analysis and making his adjustments.

Overall, the comparables as adjusted in Plaintiff's Main Store appraisal provide a clearer picture than those in Defendant's appraisal. Not only did Plaintiff's comparables better comport

with the subjects' highest and best use, they were also much closer in size to the subjects than Defendant's. Defendant's largest comparable (the Sears at 132,633 square feet) was scarcely larger than Plaintiff's smallest (120,844 square feet). Plaintiff provided four comparables exceeding 170,000 square feet, whereas three of Defendant's comparables were approximately 60,000 square feet, including both of the discount department stores. Plaintiff's appraiser testified that all adjustments were based on his review of the leases in question and of the local conditions within each comparable's trade area, whereas Defendant's appraiser admitted that he had not reviewed the lease of the Sears store. While Plaintiff's appraiser did not adjust his comparables for age, the court accepts his testimony that properties like the subjects are evaluated based on effective age and that effective age was reflected in his condition and quality adjustments.

Plaintiff's appraiser testified that occupancy cost-to-sales ratio analysis is standard in department-store appraisals. Defendant urges the court to reject that approach on theoretical grounds as geared toward value in use rather than market value. Defendant makes a good point; the value sought is that ascribed by the market rather than by any particular user. However, Plaintiff's appraiser demonstrated a high level of expertise specific to department store valuation, and the court does not lightly discard his testimony. Department stores present a special challenge because they are rarely sold or leased; it is therefore desirable to extract market data in other ways where possible. Department store buildings also differ from other spaces because they are used exclusively by a handful of identifiable national tenants operating many stores in similar ways. A survey of sales and occupancy costs for all department stores could therefore be a survey of the market. If such occupancy costs and sales bear a constant proportion, it may be

///

possible to arrive at an expected rent for a given store, barring unusual characteristics of the property or the local trade area.

However, even assuming the theoretical validity of occupancy cost-to-sales ratio analysis as a valuation approach, the evidence here does not show that the ratio is a constant. The table reporting Plaintiff's appraiser's survey of 73 department-store occupancy costs shows a median occupancy cost-to-sales ratio of 4.31 percent and a mean of 5.48 percent—a difference equal to 27 percent of the lower number. (Ex 1M at 95.) The standard deviation is not provided, and the breakdown by sales category shows variations in the ratio from 2.08 percent to 6.44 percent. (*Id*.) Although the median and mean are somewhat closer in the data of Oregon, Washington, and Idaho properties—4.00 percent and 4.72 percent, respectively—that table shows neither the size of the sample nor the sales categories of the surveyed stores. Without better evidence of a constant ratio, predictions of market rent based on occupancy costs and sales are unreliable.

Although the court cannot determine the subjects' value from their occupancy costs and sales, the Main Store market rent found by Plaintiff's appraiser remains better supported than that found by Defendant, due to better rent comparables and more credible adjustments. The court accepts Plaintiff's appraiser's conclusion of a $5.75-per-square-foot market rent for the Main Store.

Plaintiff's appraiser concluded to a lower market rent for the Home Store, partly because he adjusted the rent comparables lower in relation to the Home Store, but mostly because his occupancy cost-to-sales ratio analysis indicated a much lower rent.

With respect to the rent comparables, the court's evaluation of the adjustments specific to the Home Store is hindered by the failure to include the rent-comparable table in Plaintiff's appraisal. It appears the adjustments were based on the Home Store's allegedly inferior

placement and access at the mall, which might be dampening its current sales and might also hinder future redevelopment. However, it is premature to base a valuation on future redevelopment when the subject's highest and best remains that of a single-tenant department store. Furthermore, any current impact on the store's performance was not quantified in a way that isolated the effects of the Home Store's different merchandising line.

The occupancy cost-to-sales ratio analysis of the Home Store suffers from the same defects as that of the Main Store, with the additional defect that the appraiser did not use the subject's actual sales, instead calculating a hypothetical sales-per-square-foot figure because the subject's actual sales were quite low due in part to its merchandising line.

Plaintiff has not shown that the Home Store's market rent is less than the Main Store's. The court therefore applies a $5.75-per-square-foot market rent to the Home Store as well.

2.      Overall Capitalization Rates

Both parties' appraisers relied on lists of unadjusted leased-fee sales as indicators of the subjects' overall capitalization rates. In addition, Plaintiff's appraiser supported his conclusion with an investor survey and a mortgage-equity analysis.

Both appraisers expanded their list of leased-fee sales beyond the comparables included in their respective sales approaches. Plaintiff included discount department stores and big-box discount retailers among its leased-fee sales. Defendant also included such properties, as well as big-box home improvement stores. Plaintiff's appraiser derived an overall capitalization rate of 6.75 to 7.75 percent from his list. Defendant dropped two decimal places from his conclusion of a 7-percent capitalization rate, indicating a margin of error equivalent to a range of 6.50 to 7.49 percent.

/ / /

Although both appraisers' leased-fee sales support their concluded ranges, Plaintiff's data was more tightly focused on general retail, included more sales, and included a higher proportion of anchor department store sales. The inclusion of home-improvement stores in Defendant's data tended to skew the capitalization rate downward. As noted by Defendant's appraiser, the average capitalization rate of the department stores among his leased-fee sales was 7.18 percent, above the midpoint of his range. All told, the more probable overall capitalization rate from the leased-fee sales is the midpoint of Plaintiff's appraiser's range, 7.25 percent.

The national survey results include all sorts of retail net lease properties, not merely department stores. They add little to the leased-fee sales analysis, indicating an even broader range of 5.25 to 9.00 percent.

The mortgage-equity analysis derives a capitalization rate based on market mortgage terms, a desired equity yield rate, and an assumed appreciation rate over a projection period. Plaintiff's appraiser used a 15.00-percent yield rate and a 2.50-percent annual appreciation rate for the Main Store, and concluded to a 7.19-percent overall capitalization rate. He used a 16.00-percent yield rate and a 2.25-percent annual appreciation rate for the Home Store, and concluded to a 7.78-percent overall capitalization rate. In each of his reports, he described his assumed yield rate as "a reflection of current rates of return sought by equity investors." (Ex 1M at 109; Ex 1H at 112.) In each of his reports, he stated that the annual appreciation rate "is projected based on our view of current market conditions as well as future conditions anticipated during the holding period." (*Id.*) In testimony, he stated that he had added the additional percentage point to the Home Store's yield rate to account for the additional risk of taking on a property with diminished capability for redevelopment due to its having no lower-level entrance.

/ / /

While it is plausible that an investor would consider future redevelopment when purchasing a property, it is unclear that any effect on the capitalization rate would be of the magnitude assumed by Plaintiff's appraiser or that it would not be counteracted by other factors. Plaintiff's appraiser has provided an intriguing formula, but as applied here it relies on his unsupported estimate of market demand and future appreciation. The court is unable to evaluate that estimate.

Ultimately, the leased-fee sales are the best evidence of the subjects' capitalization rates. Those sales support an overall capitalization rate of 7.25 percent for both the Main Store and the Home Store.

Given a market rent of $5.75 per square foot, no vacancy or collection losses, 1 percent operating expenses, and a 7.25-percent overall capitalization rate, the indicated values under the income capitalization approach are $15,650,000 for the Main Store and $13,250,000 for the Home Store.

C.    *Sales Comparison Approach*

Although Defendant's appraiser prepared a sales comparison approach, he gave it no weight in his final reconciliation of value. Indeed, the comparable sales identified in that report are of limited value here: only two of the seven were department stores; the others were big-box retail and home-improvement stores. The two department stores were located in Phoenix, Arizona, and Alexandria, Virginia, both markets with which Defendant's appraiser was unfamiliar. The Alexandria store was converted into a homeless shelter after sale, strongly indicating either atypical market behavior or a radical change in highest and best use. The Phoenix store was half the size of the Main Store, and information needed to properly adjust its

///

sale was lacking: it was sold with a lease in place, which Defendant's appraiser did not review, and it was unknown whether it was located in a mall.

Plaintiff's appraiser assigned nearly half the weight in his final reconciliations to the sales approach, concluding to higher values than his income approaches alone indicated. Yet unrebutted testimony discredited his best comparable sale, the Sears at Lloyd Center, by alleging it was part of a portfolio sale. One of his other comparables had a 100-percent "economics" adjustment to the Main Store (75 percent to the Home Store), which was admittedly subjective. Gross adjustments to the other comparables were also significant: 35 to 65 percent for the Main Store and 45 to 60 percent for the Home Store, including large subjective "economics" adjustments.

Because good sales comparables were so few and required so many adjustments, the sales comparison approaches provide less confidence than the income approaches here. They bear some value as a cross-check on the income approaches, and the court accepts the judgment of Plaintiff's appraiser that the comparable sales indicate the Main Store's value is slightly higher than indicated by the income approach; that value is $15,800,000 for the Main Store. The sales comparison approach has no effect on the court's determination of the Home Store's value, which is $13,250,000 as indicated by the income capitalization approach.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

III. CONCLUSION

Based on the evidence, as analyzed above, some value reduction to both subjects is warranted. This appeal concerns the Main Store. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the Main Store as of the 2017–18 assessment date was $15,800,000.

Dated this ___ day of January, 2020.


_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on January 21, 2020.*