IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PHILLY, LLC,                                    )
                                               )
            Plaintiff,                         )      TC-MD 240189G
                                               )
      v.                                       )
                                               )
HOOD RIVER COUNTY ASSESSOR,                    )
                                               )
            Defendant.                         )      **DECISION**

Plaintiff appealed the 2023–24 real market value of a health club undergoing renovations as of the assessment date.[1]  Plaintiff was represented at trial by Alex Robinson of CKR Law Group and called Owen Bartels, MAI, as a witness.  Defendant was represented by Dominic Carollo and Julie Poage of Carollo Law Group and called Anne Pulis-Tappouni, PhD (Critical Studies), MAI, as a witness.  The two experts' appraisal reports were admitted as Plaintiff's Exhibit 1 (PE 1-126) and Defendant's Exhibit A (DE 1-127).

## I.  STATEMENT OF FACTS

The subject account (subject) is the southern of two adjacent tax lots on which the Hood River Athletic Club is sited.  (PE 20-22.)  It contains the improvements value for the entire club building, as well as its own land value.  The parties' appraisers agreed in valuing the subject by subtracting the northern lot's land value from the total value of both lots together.[2]  Plaintiff purchased the subject and the adjacent northern lot in December 2021 for $2,500,000 in a "cash, arm's-length, off-market transaction."  (DE 33; PE 11.)

/ / /

---

[1] The property at issue is identified as Account 9453 in Defendant's records.

[2] Dr. Tappouni's appraisal assignment did not distinguish the two tax accounts; she stated her agreement with Mr. Bartels's method of deducting land value at trial.

A.      *Physical Features and Renovations*

The subject has been owner-occupied and operated as a health club since it was built in 1985.  (DE 33; PE 24.)  The club is housed in two connected structures totaling about 53,146 square feet:[3] the tennis center (about 60 percent of the square footage) and the main building (about 40 percent).  (PE 24-25, 29; DE 38-42.)  The tennis center is "an open-span, metal framed warehouse building" without windows, heat, or air conditioning, looked over by a mezzanine with an observation deck and a childcare room.  (PE 29-30; DE 39-42.)  The main building is constructed around a grassy courtyard and contains workout rooms, locker rooms, and a lobby area with a café and commercial kitchen.  (PE 25-30, DE 38-42.)  The club is served by a parking lot with 52 or 55 spaces.[4]  (PE 32; DE 37.)  As of the assessment date, its pool and hot tub had been decommissioned and were slated for removal.

The main building was undergoing renovations on the assessment date.  Work done from 2022 to 2023 included the addition of a new main entry façade, new lighting, upgraded flooring, cabinets, and countertops in the lobby and kitchen areas, and conversion of racquetball and squash courts into general fitness areas.  (PE 24-28; DE 42.)  Significantly, the renovations included decommissioning and removing the subject's swimming pool and hot tub, which "had been causing moisture penetration problems throughout the structure."  (PE 24; DE 10.)  The renovations had mainly been completed by the assessment date, with the exception of removing the decommissioned pool and converting the space into another workout room.  (DE 42.)  The total contracted cost for the renovations, including work yet to be completed on the assessment date, was $1,589,701.79.  (DE 64.)

---

[3] The court accepts Plaintiff's square footage because Defendant's "approximately 49,025 square feet" is taken from floor plans that "do not represent 'as-builts.'"  DE 38.

[4] Mr. Bartels lists 55 spaces; Dr. Tappouni lists 52.

The appraisers divided on how much value the renovations added to the subject. According to Mr. Bartels, many of the renovations were remedial to correct moisture damage, and the loss of the swimming pool diminished the subject's utility as a health club. He valued the subject as if the renovations were 100 percent complete, because the data did not support dividing the renovation costs between remedial and nonremedial work. Dr. Tappouni, in contrast, concluded that all of the renovation costs added value because removing the swimming pool freed the subject for other uses. She therefore reduced her final value by the contracted costs of the renovations remaining on the assessment date (about $356,000). (DE 64-65.)

B.      *Appraisers' Reports*

Mr. Bartels prepared an appraisal report for Plaintiff, and Dr. Tappouni prepared an appraisal report for Defendant. The two experts' concluded values differed dramatically: Mr. Bartels valued the subject at $2,750,000, while Dr. Tappouni valued it at $7,470,000 as 100 percent complete before making a $356,000 downward adjustment for projected remaining renovation costs. (PE 72; DE 65.) The appraisers' differences in chosen comparables and approaches to value are rooted in their differing highest and best use conclusions.

1.      *Highest and best use*

The subject's commercial zoning allows for "commercial uses, industrial uses incidental and essential to an on-site commercial use, parking lots, multi-family dwellings, professional offices, and hostels." (DE 43.) Manufacturing is allowed if the manufactured goods are "sold on a retail basis out of the commercial use which is the storefront for such sale." (*Id*.) Use as a health club "is generally considered a commercial use and is therefore * * * legally permitted per zoning." (*Id*.)

/ / /

Setting aside the subject's current improvements, the subject site would support the above uses "on a moderate scale." (DE 43.) Mr. Bartels and Dr. Tappouni agree that if the subject were vacant, its highest and best use would be as mixed-use commercial rather than as a health club of the existing type. (PE 37; DE 43.) However, given the subject's current improvements, the appraisers' conclusions vary.

Mr. Bartels concluded that the subject's highest and best use as improved was continued use as a health club. (PE 38.) He testified that conversion to an alternative use was not "realistic" given parking and access issues. Vehicles entering the subject from the north-south artery to the east must cross the neighboring property. (*See* PE 21; DE 36.) Mr. Bartels testified that arrangement is by oral agreement between Plaintiff and the neighboring owner; he doubts the agreement would be extended to allow truck access needed for larger commercial or industrial use. Mr. Bartels further testified that elements of the renovation—such as the café and commercial kitchen—would be superfluous for light industrial use. He concluded the subject's most probable buyer was another local or regional health club operator because the subject "does not fit with brand standards for larger chains." (PE 38.)

Dr. Tappouni determined that the subject's highest and best use as improved was "continued commercial use – either as a health club or other large-scale commercial use or mixed use." (DE 45.) She expands upon potential uses in her report:

> "Ultimately it appears that continued use as a health club is potentially financially feasible, but may require some adjustment in business plan in order to be maximally productive. Alternative uses that may be productive could include large-scale retail outlet, a mixed commercial/manufacturing use such as brewery with retail area and tasting room, or other manufacturing business headquarters with commercial showroom space open to the public. Depending upon user requirements, the use could be enhanced by a retrofitted roll-up door or doors into the building's metal component."

/ / /

(DE 44.)  Thus, Dr. Tappouni views the subject's highest and best use as encompassing a "health club," a "large-scale retail outlet," a "brewery with retail area," a "manufacturing business headquarters with commercial showroom," or another "mixed commercial/manufacturing" enterprise.

2.      *Approaches to value*

The two appraisers each prepared a sales comparison approach but disagreed about the relevance of the other approaches.  Mr. Bartels prepared a cost approach and did not develop the income capitalization approach.  He found insufficient data to determine a lease rate or capitalization rate for a locally operated stand-alone health club; the only leased health clubs are built to suit by brand-name chains.  Dr. Tappouni prepared an income approach, but not a cost approach.  She found no reliable method of determining the depreciation of a 1985 building with metal and masonry components and lacking in cost comparables.

a.      Plaintiff's appraisal

(1)      Cost approach

Mr. Bartels valued the subject's improvements using Marshall & Swift cost factors, depreciated by over 80 percent.  That depreciation included a 47.62 percent reduction for physical deterioration, based on an effective age of 20 years with an expected life of 42 years. (PE 70.)  It also included a 27.6 percent reduction for functional obsolescence due to removal of the pool, equal to the proportion of memberships canceled following the pool closure.  (*Id*.) Finally, it included a 10 percent reduction for external obsolescence from changes in the health club market following the Covid-19 pandemic.  (*Id*.)

The majority of Mr. Bartels's cost approach analysis consisted of determining the subject's land value from adjusted comparable land sales.  (PE 58-68.)  He concluded to a land

value of $20 per square foot. (PE 67.) That value was his basis for concluding the northern lot's value was $810,000, a figure adopted by both parties as an acceptable deduction from the two lots' combined value as indicated by the sales comparison approach. (*Id.*)

Mr. Bartels's cost approach conclusion was $2,560,000. (PE 71.) He testified he did not place primary reliance on the cost approach, viewing it as a secondary check on the sales comparison approach.

(2)     Sales comparison approach

Mr. Bartels chose "health club properties" as comparables, also giving consideration to "sports and recreation facilities." (PE 43.) First among his sales comparables was the subject's sister club in The Dalles, which had been developed by the same operator. (PE 45-46.) That 57,981-square-foot facility sold in January 2022 for $2,095,000, or $36.13 per square foot. (*Id.*) It included separate buildings for a swimming pool, tennis courts, and dance classes. (PE 46.) Its sale price did not include an additional $200,000 allocation for business and intangibles. (*Id.*)

Mr. Bartels's second comparable was a portfolio sale of two clubs in July 2021: a 30,000-square-foot building in Milwaukie, and a 27,000-square-foot building in Clackamas. (PE 47.) The two clubs sold together for $3,759,000, or $66 per square foot. (*Id.*) Both clubs contained lap pools, fitness rooms, locker rooms, and multipurpose sport courts. (*Id.*) The sales price did not include personal property, which was separately allocated. (*Id.*)

Mr. Bartels's three remaining comparables were former health clubs that underwent changes of use after sale. The 31,165-square-foot Highline Athletic Club in Burien, Washington, was purchased by the Muslim American Youth Foundation for $115.46 per square foot and subsequently used for a combination of athletic programming and classroom space. (PE 45.) The 71,487-square-foot YMCA building in Eugene was purchased for $40.56 per square foot

and subsequently demolished except for its tennis center. (*Id.*) The 20,040-square-foot Olympic Fitness Club in Port Orchard, Washington, was purchased by the county for $74.85 per square foot and converted into temporary housing. (*Id.*)

Mr. Bartels adjusted his comparables' sale prices for market conditions and qualitatively evaluated their similarity to the subject on the bases of location, size, amenities, and age/condition. (PE 51-54.) He considered the sister club in The Dalles inferior to the subject because of its location, amenities, and condition; he considered the Eugene YMCA inferior because of its larger size and poor condition. (PE 54.) His other three comparables he considered superior because of their locations and smaller sizes. (*Id.*) After adjusting, he found a price distinction between large-format and small-format clubs, with the former (the sister club and the YMCA) selling for $38 to $43 per square foot and the latter selling for $71 to $126 per square foot. (PE 55-56.)

Mr. Bartels concluded that the subject, as a recently remodeled large-format club, would sell just below the range for small-format clubs, at $65 to $70 per square foot. (PE 56.) Applying a "middle of the range" value of $68 per square foot, he determined that the value of both lots was $3,610,000. (*Id.*) Subtracting $810,000 for the land value of the northern lot, he concluded that the subject's value was $2,800,000. (*Id.*)

### (3)     Plaintiff's reconciliation

Mr. Bartels concluded to a real market value for the subject of $2,750,000, slightly reducing his sales approach conclusion because of the lower value reached by the cost approach. (PE 72.)

/ / /

/ / /

b.    Defendant's appraisal

Dr. Tappouni developed sales comparison and income capitalization approaches to determine the subject's value "as if completed," then adjusted the reconciled value downward by the projected remaining costs of the renovation as of the assessment date.

(1)    Sales comparison approach

Dr. Tappouni included six comparables in her analysis, selecting renovated multi-use spaces without swimming pools as comparables. She testified that it was essential to use comparables without swimming pools because the subject was being remodeled to remove its pool.

Two of Dr. Tappouni's comparables had been previously used as either a health club or an athletics facility. Comparable 5 was a health club before its sale to the Islamic Center of Tacoma for a new use involving classrooms and athletic activities. (DE 49-50.) It was located across the street from the Costco in Tacoma, Washington, and had 284 parking spaces and 69,546 square feet of recently renovated space; it sold for $158 per square foot in October 2022. (*Id.*) Comparable 4 was a gymnastics center before its sale for $125 per square foot in January 2022. (DE 49.) It was a 27,224-square-foot building near the I-205/SR-500 interchange in Vancouver, Washington, that sold vacant to a nonprofit organization and "is being considered for possible resale to the City of Vancouver for re-purposing as a homeless shelter." (*Id.*)

Dr. Tappouni's other four comparables had never been used as health clubs or athletics facilities. Her Comparable 1 was a 68,840-square-foot facility in Hillsboro, built to suit a semiconductor-product manufacturer in 2020; it sold new for $170 per square foot. (DE 47-49.) Her Comparables 2 and 3 were light industrial properties in Portland built in 2019 and 2020, each about 50,000 square feet, and each selling for $156 per square foot in a portfolio. (DE 49.)

Her Comparable 6 was a 40,000-square-foot showroom building in Medford with "warehouse space, large retail showroom, and sales offices." (DE 50.) It was sold to its tenant—"an auto parts, auto merchandise, and outdoor gear dealer"—for $130 per square foot in January 2023. (*Id.*)

Dr. Tappouni qualitatively evaluated her comparables' similarity to the subject in date of sale,[5] city size ("location"), situation relative to major streets ("frontage/access"), quality/condition, presence of loading doors ("adaptability"), presence of a courtyard, and size. (DE 51-52.) For example, she determined her second and third comparables were similar to the subject overall after considering them superior to the subject in city size, quality/condition, and presence of loading doors, but inferior in having sold over a year before the assessment date, being situated on a cul-de-sac, and lacking a courtyard. (*Id.*) She determined that her Comparable 4 was inferior to the subject, her Comparable 1 was superior, and the remaining two comparables were similar. (*Id.*)

The range in sale prices of Dr. Tappouni's similar properties was $130 to $158 per square foot. (DE 53.) Considering that more sales occurred at the high end of that range, she chose $150 per square foot in determining the subject's value, leading to a calculated value of $7,354,000 "as if completed." (*Id.*)

### (2) Income capitalization approach

Dr. Tappouni developed an income approach using eight lease comparables. (DE 55-58.) Seven of the eight comparables were located in shopping centers, and seven were located in the Portland metropolitan area. (*Id.*)

/ / /

---

[5] She did not make numerical adjustments for market conditions.

The two properties she considered most similar to the subject were a 24,583-square-foot unit in Tigard operated by a batting cage franchise, and a 26,928-square-foot space in Gresham operated as a trampoline park. (DE 55-58.) Those properties leased for $0.95 and $1.08 per square foot, respectively. (*Id.*) Dr. Tappouni judged that both properties' superior locations and smaller sizes were balanced out by their inferior "quality/condition" and by "market conditions." (*Id.*)

Her remaining six comparables included three spaces leased to retailers and three leased to Planet Fitness. The three largest properties were the ones leased to retailers: a 47,451-square-foot freestanding building in West Linn leased to Parkrose Hardware at $0.79 per square foot; a 40,160-square-foot space in a two-unit freestanding building in Portland leased to JoAnn Fabrics at $1.21 per square foot; and 30,163 square feet of anchor tenant space in the Hood River Shopping Center leased to Cascade Farm & Outdoor at $1.50 per square foot. (DE 55-58.) The three Planet Fitness properties were located in Portland, Beaverton, and Aloha. (*Id.*) They ranged in size from 22,166 to 25,000 square feet and leased for $1.17 to $1.85 per square foot. (*Id.*)

From her analysis of the above comparables, Dr. Tappouni determined the subject's market rent would be $1.00 per square foot. (DE 58.) She concluded to a capitalization rate of 7.00 percent after examining five sales of leased properties, including two health clubs: "Vasa Fitness" in Colorado Springs, Colorado (7.22 percent) and Planet Fitness in Sherwood (7.05 percent). (DE 59-60.) She also consulted market studies of capitalization rates for retail spaces (6.29 to 6.38 percent) and for regional malls (average 7.33 percent). (DE 61.) Her indicated value "as if completed" under the income approach was $7,585,000. (*Id.*)

/ / /

Dr. Tappouni gave "moderate" weight to each of her two approaches, considering her comparable data reliable while noting that the comparable sales included neither "relevant comparables in the immediate subject market, nor buildings with the same specific mix of uses or amenities." (DE 63.)  Her reconciled value was $7,470,000 as if completed. (*Id.*)  Dr. Tappouni reduced that "as if completed" value by $356,000—to $7,114,000—to account for the portion of the renovations that remained unfinished on the assessment date.  (DE 64-65.)  At trial, she accepted Mr. Bartels's $810,000 deduction for the land value of the northern lot.

3.     *Tax roll and requested relief*

Defendant placed a real market value of $3,854,690 on the 2023-24 tax roll, which was upheld by the board of property tax appeals.  (Compl at 3-4.)  Plaintiff asks the court to reduce that value to $2,750,000, the amount concluded by Mr. Bartels.  Defendant asks the court to raise that value to the amount concluded by Dr. Tappouni in her report, less $810,000 for the land value of the northern lot conceded at trial: $6,304,000.

## II.  ANALYSIS

The issue before the court is the real market value of the subject for the 2023–24 tax year. Real market value is defined as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[6]  The assessment date for the 2023–24 tax year was January 1, 2023.  *See* ORS 308.007; 308.210. Real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  ORS 308.205(2).  Three approaches to value must be

---

[6] The court's references to the Oregon Revised Statutes (ORS) are to 2021.

considered but may not be applicable in every case: the cost approach; the sales comparison approach; and the income approach. Oregon Administrative Rule (OAR) 150-308-0240(2)(a) (2023); *see also Dept. of Rev. v. River's Edge Investments*, 359 Or 822, 827, 377 P3d 540 (2016).

Each party must bear the burden of proof to the extent it seeks an order changing the tax roll. ORS 305.427. Thus, it falls on Plaintiff to prove a reduction of tax roll value is warranted, and on Defendant to prove an increase. *See id*. The applicable standard is a preponderance of the evidence. *Id*. This court "has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

The parties' 2023-24 real market value dispute stems largely from their appraisers' disagreement about the subject's highest and best use as improved. Mr. Bartels defines the subject's highest and best use as a health club, with an owner-operator as its most likely buyer. Dr. Tappouni describes the subject's highest and best use as encompassing retail, commercial, and manufacturing uses. Those differing conclusions led the appraisers to different sets of comparables.

A. *Highest and Best Use as Improved*

A property's highest and best use sets "a critical framework" for selecting comparables and is therefore "[t]he first question that must be addressed in a credible appraisal." *Hewlett-Packard Co. v. Benton County Assessor*, 21 OTR 186, 188 (2013), *aff'd*, 357 Or 598, 356 P3d 70 (2015). That is particularly the case "in times of general economic transition or transition in particular industries," where a highest and best use equal to the current use cannot be assumed. *Id*. at 189.

/ / /

Here, both Mr. Bartels and Dr. Tappouni agree that the health club industry was in flux following the pandemic-related shutdowns beginning in 2020. They also agree that the subject's site would have been more profitably developed for another use if it were vacant on the assessment date. Thus, it was incumbent on them to prepare highest-and-best-use analyses of the site, rather than assuming that its current use was its highest and best. *See Hewlett-Packard*, 21 OTR at 189. Both appraisers performed that analysis, and both concluded the subject's current use was its highest and best use as improved. However, they characterized that current use at different levels of generality.

The idea behind Dr. Tappouni's broadly formulated commercial/industrial highest and best use is that, without the swimming pool, the subject's shell could conceivably be refitted for a variety of purposes. Allowing that to be true regarding the structure, the subject's use remains limited by other factors. Its parking lot is too small for large-scale retail, and it is not located in a shopping center that would support such a use. Likewise, its possibilities for manufacturing use are limited both by its location and by its lack of truck access. Neither its metal-framed tennis center nor its commercial kitchen is suited for office use. Those factors suggest the subject is not interchangeable with other commercial or light industrial properties. Its highest and best use is more specific than general commercial or industrial.

On the available evidence, the subject's highest and best use is most likely as a single-tenant, large-format health club. That was the subject's current use on the assessment date, and it was undergoing remodeling to continue in that use. While decommissioning the pool reduced its utility as a health club, its commercial kitchen and façade were specifically configured for health club use, as were its locker rooms and racquet sports court. Plaintiff's investment in continuing that use soon after purchase is indicative of how market participants viewed the

subject's highest and best use on the assessment date.  Its use was specifically as an independently operated health club because it did not fit brand standards for health club chains.

Health club use is perhaps only marginally feasible—both appraisers agreed that vacant land on the site would be developed differently—but it is the best-supported highest and best use for the subject.

B.      *Approaches to Value*

The subject's highest and best use as a health club provides the framework for evaluating the remainder of the parties' appraisals.  *See Hewlett-Packard*, 21 OTR at 188.

1.      *Cost approach*

The chief importance of Mr. Bartels's cost approach lies in the $20-per-square-foot land value he concluded.  From that, he computed a value of $810,000 for the 40,511-square-foot northern lot, which he deducted from the two lots' total value indicated by his sales comparison approach.  (PE 22; PE 67.)  That deduction was accepted by all parties as an appropriate adjustment to the sales comparison indication, and the court likewise accepts it.

The improvements value indicated by Mr. Bartels's cost approach is unreliable due to the subject's age and the mismatch between its highest and best use as vacant and as improved. Significant depreciation from cost to construct new is needed, with thin market data on which to base it.  Mr. Bartels estimated depreciation at over 80 percent.  With that magnitude of depreciation and scant evidence, the court places no weight on the cost approach except as a land adjustment to other approaches.

2.      *Sales comparison approach*

It is of primary importance that a comparable's highest and best use be similar to the valuation subject's.  Where the seller and buyer of a comparable use the property for different

purposes, it is the buyer whose usage best indicates the property's highest and best use. Here, all of Mr. Bartels's comparable properties had been constructed as freestanding health clubs, but only three (Comparables 1 and 2, the latter of which comprises two buildings) were purchased for that continued use. Dr. Tappouni's comparables included no sales of buildings to be used as health clubs; only her Comparable 5 had been constructed for that purpose.[7]

The best comparables supplied overall are the two properties included in Mr. Bartels's Comparable 2, which were both sold for use as health clubs. Although they lacked the subject's area for racquet sports, that deficiency was partly balanced by their inclusion of multipurpose sport courts and lap pools. Their smaller sizes were superior to the subject's large size, as were the larger markets available in their metropolitan locations, although their effective ages were inferior. One could wish for better comparables, but the Comparable 2 properties support Mr. Bartels's concluded value range of $65 to $70 per square foot for the subject.

Mr. Bartels's Comparable 1—the subject's "sister club" in The Dalles—is comparable to the subject before the renovation. It is located in a smaller market but is similar to the subject in size, amenities, and age. Its unrenovated $36-per-square-foot sale price is relevant to the subject's value after renovation because it supports Plaintiff's statement that the moisture damage from the subject's swimming pool was unknown at the time Plaintiff purchased it. Comparable 1 had no such damage—its pool was in a separate building—and yet still sold for less than the subject's $47 per square foot.

/ / /

---

[7] Dr. Tappouni's decision to exclude all properties with swimming pools appears to have unnecessarily contracted the set of sales from which she chose comparables. While physically similar buildings are preferable, physical features are only one factor in determining highest and best use, alongside legal rights, financial feasibility within a market, and risk. Overreliance on a swimming pool feature downplays the importance of other factors— such as truck accessibility and market demand for alternative uses.

While the athletic and educational programming to which Mr. Bartels's Comparable 3 and Dr. Tappouni's Comparable 5 were repurposed after sale might be analogous to health club use, that fact is not established by the evidence. The fact that those properties were repurposed from health club uses suggests the new uses were more productive in Burien and Tacoma. The evidence does not show that such a use would be feasible for the subject in Hood River. Those comparables' respective $115- and $158-per-square-foot sales prices are not helpful indicators. None of the other athletic facilities or health clubs proposed as comparables by the appraisers were purchased for use of the existing improvements as anything like a health club.

Dr. Tappouni's remaining sales are not comparable to the subject. None had ever been used for a purpose remotely similar to a health club, and none were purchased for such a use. Three were newly built light industrial facilities, including a built-to-suit semiconductor product manufacturing facility. The fact that they were newly built suggests that, unlike the subject, there was no mismatch between their highest and best uses as vacant and as improved. The fourth was an auto parts retail store with a warehouse. The evidence does not show that manufacturing, retail, or warehouse use would be viable for the subject given its parking and street access.

A good sales approach includes "sales adjusted for time, location, size, quality, and other distinguishing differences." *Yarbrough v. Dept. of Rev.*, 21 OTR 40, 44 (2012). Mr. Bartels adjusted for time, but both appraisers otherwise limited themselves to qualitative comparisons of selected property traits due to lack of hard data. Mr. Bartels compared location, building size, amenities, and age/condition, which are all fairly standard factors to consider. Dr. Tappouni's list separated out two aspects of location—city size and street access—and two forms of

amenity—loading doors and courtyards. She also included "date of sale" (i.e., market conditions) among the qualitative factors.

Dr. Tappouni's qualitative evaluation appears distorted by its inclusion of multiple location and amenity factors, as well as by its inclusion of date of sale. She appears to have given equal weight to each of her factors in assessing each comparable's overall similarity—in every case, the comparable's overall similarity corresponds to whether a greater number of factors are deemed "superior" or "inferior." For instance, she judged that her Comparables 2 and 3, both newly built industrial properties, were similar to the subject overall and finding them superior in three traits (city size, age/quality, and presence of loading doors) and inferior in three traits (market conditions, proximity of major streets, and presence of a courtyard). If she had made a quantitative adjustment for market conditions and thus removed it from her qualitative comparison, there would have been one more superior factor than inferior; might the buildings have then been deemed superior overall? It is also doubtful that the subject's market values a courtyard as equivalent to location or quality—at least, no evidence has been presented that it does—yet they receive equal weight in Dr. Tappouni's comparison.

Recognizing that the subject is difficult to value because of limitations in the available evidence, the court finds Mr. Bartels's sales comparison approach more credible than Dr. Tappouni's, because his chosen comparables better aligned with the subject's highest and best use and his adjustments and comparisons were more relevant to market value.

3.      *Income capitalization approach*

Evaluating the subject using the income approach requires data showing the lease rates of similar properties, but highest and best use differences limit the reliability of the data provided.

/ / /

The comparable leases supporting Dr. Tappouni's income approach included three national franchise-branded health clubs in metropolitan shopping centers. Because the subject does not meet brand standards for any of the national chains, it is not a substitute for any of those three properties. Dr. Tappouni recognized that those three comparables were significantly superior to the subject, with average lease rates over 40 percent higher than her concluded lease rate for the subject, but even so they are not good indicators of the subject's market lease rate.

The other comparable leased properties were not in use as health clubs of any type. The two deemed most similar to the subject were a batting cage and a trampoline park. Because they do not share the subject's highest and best use, they are not reliable indicators of the subject's value.

Lacking lease data from properties sharing the subject's highest and best use, the income approach is unreliable, and the court gives it no weight.

C.      *Reconciliation*

Mr. Bartels's sales approach is the most credible value determination presented to the court because he correctly identified the subject's highest and best use and found comparables consistent with that use. His cost approach to the improvements value was too speculative and is given no weight. Dr. Tappouni's appraisal report is flawed by its overly broad highest and best use conclusion, which resulted in sales and lease comparables that were not relevant.

The subject's recent $2,500,000 sale price and projected $1,590,000 cost of renovation suggest a real market value of no more than $3,280,000, with the true value likely less because some renovations remediated moisture damage and removed the pool, reducing the subject's utility as a health club. While the subject's arm's-length sale to Plaintiff was off-market, its reasonableness is supported by the sister club's market sale in The Dalles. Dr. Tappouni's

modified concluded value of $6,304,000—to which Defendant requested the roll value be raised—is unmoored from the actual, arm's-length transactions undertaken by the subject's owners. Mr. Bartels's sales approach conclusion of $2,800,000 is more credible.

With few market transactions involving health clubs, the court finds little ground for differing from Mr. Bartels's sales approach conclusion. Furthermore, the court agrees that the remaining work to be done on the assessment date was not value-adding and finds that the subject's 2023-24 real market value incorporates all the value of the renovations.

## III. CONCLUSION

The best available evidence supports a 2023–24 real market value of $2,800,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2023–24 tax roll real market value of the property identified as Account 9453 is $2,800,000.

_____
POUL F. LUNDGREN
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on November 19, 2025.*